CITY OF LOS ANGELES DEPART-
MENT OF AIRPORTS et al.,
Petitioners,

v.

UNITED STATES DEPARTMENT
OF TRANSPORTATION et
al., Respondents,

Aero California et al., Intervenors.

Nos. 95–1344, 95–1361, 95–1387,
95–1388 and 95–1422.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 6, 1996.

Decided Jan. 17, 1997.

Steven S. Rosenthal, argued the cause, for petitioner City of Los Angeles, CA, with whom G. Brian Busey, Washington, DC, and Breton K. Lobner, Los Angeles, CA, were on the briefs.

William Karas, argued the cause, for petitioners Aero California et al., with whom Frank J. Costello, Jr., Washington, DC, was on the briefs.

Walter A. Smith, Jr., argued the cause, for petitioners Air Transport Association of America et al., with whom Allen R. Snyder, Jonathan L. Abram and Jonathan S. Franklin, Washington, DC, were on the briefs.

Thomas L. Ray, Attorney, U.S. Department of Transportation, argued the cause, for respondents, with whom Anne K. Bingaman, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, and Marion L. Jetton, Attorneys, Nancy E. McFadden, General Counsel, U.S. Department of Transportation, and Paul M. Geier, Assistant General Counsel, were on the brief. Robert B. Nicholson, Attorney, Washington, DC, U.S. Department of Justice, entered an appearance.

Walter A. Smith, Jr., Allen R. Snyder, Jonathan L. Abram, Jonathan S. Franklin, Frank J. Costello, Jr. and William Karas, Washington, DC, were on the brief, for intervenors Air Transport Association of America et al.

Steven S. Rosenthal, G. Brian Busey, Washington, DC, and Breton K. Lobner, Los Angeles, CA, were on the brief, for intervenor City of Los Angeles Department of Airports.

Scott P. Lewis and Patricia A. Hahn, were on the brief, for intervenor Airports Council International—North America.

Janet P. Holt, Mark S. Kahan, Susan B. Jollie, Gary B. Garofalo, Moffett B. Roller, Washington, DC, Roxanne S. Clements, New York City, Stephen H. Lachter, Lawrence D. Wasko, Stephen L. Gelband and Joanne W. Young, Washington, DC, entered appearances.

Before: EDWARDS, Chief Judge and WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The City of Los Angeles Department of Airports (hereinafter the City) and two groups of airlines request review, each for different reasons, of the order of the U.S. Department of Transportation approving in part the compensatory landing fee scheme that the City implemented in the spring of 1993. We grant the petition of the City and deny those of the airlines.

## I.  BACKGROUND

Until 1993 the City calculated the landing fee at Los Angeles International Airport (LAX) by subtracting estimated airport revenues from estimated airport expenses and dividing the remainder by the total estimated landed weight for the coming fiscal year. This so-called residual fee methodology produced landing fees that ranged from a low of $.26 per 1,000 pounds of landed weight in 1989 to a high of $.75 per 1,000 pounds of landed weight in 1982 and 1983. In 1992, the last year in which the City used this methodology, the fee was $.51 per 1,000 pounds of landed weight.

Anticipating the expiration of its fee agreements with the airlines, the City reevaluated its choice of the residual fee methodology. The City concluded that the practice of setting the annual landing fee so that total airport revenues would match total airport expenses resulted in a landing fee that was heavily subsidized by non-aeronautical air-

port revenues, such as parking contracts and concession franchising. In order to eliminate this subsidy and to increase the total revenues from LAX, the City decided to switch to a compensatory fee methodology when its residual fee agreements with the airlines expired at the end of 1992. Under this new approach, landing fees would reflect the actual costs to the City of maintaining and operating the airfield and the apron.

Negotiations between the airlines and the City failed to produce a compensatory fee agreement. On June 28, 1994, therefore, the City unilaterally implemented a compensatory fee system. For accounting purposes, the airport was divided into five separate direct cost centers (the terminal, the apron, the airfield, aviation, and commercial) and four indirect cost centers (systems, general maintenance, general administration, and access). Aeronautical charges no longer reflected a credit for non-aeronautical revenues in excess of non-aeronautical costs. Instead, each airline effectively reimbursed the City for the actual costs of the services rendered to that airline in each airport cost center. In particular, the landing fee now reflected all direct costs the City incurred at the airfield and the apron cost centers plus the portion of airport indirect costs allocable to the airfield and the apron. As a result of this change, the landing fee at LAX rose to $1.56 from $0.51 per 1,000 pounds of landed weight. The City informed the airlines that they would not be permitted to land at LAX if they did not pay the increased fee.

Predictably, the City landed in court, where the airlines challenged the increased fee as unreasonable, in violation of the Anti–Head Tax Act of 1973, Pub.L. No. 93–44, § 7(a), 87 Stat. 90 (as amended, reenacted, and recodified at 49 U.S.C. § 40116); an undue burden upon interstate and foreign commerce; and a violation of the Chicago Convention, numerous Bilateral Air Service Agreements, and the "rights privileges and immunities secured to the [airlines] by the Constitution, treaties and federal law." *Air Transport Ass'n v. City of Los Angeles*, 844 F.Supp. 550, 552 (C.D.Cal.1994). The district court granted the City's motion to dismiss the airlines' complaint for failure to

state a claim upon which relief could be granted. The court held that under both the Anti–Head Tax Act and § 511 of the Airport and Airways Improvement Act of 1982, Pub.L. No. 97–248, tit. V, 96 Stat. 671 (as amended, reenacted, and recodified at 49 U.S.C. § 47107), it is the task of the Secretary of Transportation to determine in the first instance whether an increased airport fee is reasonable. *Id.* at 554–55.

Faced with the possibility of being deprived of their landing privileges if they persisted in not paying the increased fee, many of the airlines entered into a so-called "standstill agreement" with the City in December 1993. The agreement, negotiated with the help of the Secretary of Transportation, provided that the airlines would pay the increased fee under protest and that the City would refund any portion of the fee that was eventually found unlawful. A lull in the fighting ensued.

On August 23, 1994 the Congress enacted § 113 of the Federal Aviation Administration Authorization Act, Pub.L. No. 103–305, 108 Stat. 1577 (codified at 49 U.S.C. § 47129). Section 113 creates an expedited administrative procedure for determining the reasonableness of airport fees and rates. An airline that wants to challenge a proposed fee increase must file a complaint no later than 60 days after receiving notice of the increase. § 113(a)(1)(B). The Secretary of Transportation then has 30 days within which to determine whether there is in fact "a significant dispute" as to the reasonableness of the fee increase. § 113(c)(2). If the Secretary finds that there is a significant dispute, then he must assign the matter to an Administrative Law Judge, who is to issue a recommended decision within 60 days. § 113(c)(2) & (3). The matter then returns to the Secretary, who must render a final decision within 120 days of the filing of the complaint, failing

which the ALJ's decision is deemed final. § 113(c)(4). In no event, therefore, should a significant dispute about the reasonableness of a fee increase remain unresolved for more than 180 days after the airport authority notifies the airlines of that increase.

The statute required the Secretary, within 90 days of its enactment, to publish regulations detailing the procedures "for acting upon any written request or complaint filed under subsection (a)(1)." § 113(b)(1). The Secretary was also required to publish in the same 90 day period substantive guidelines to be used "in determining ... whether any airport fee is reasonable." § 113(b)(2).

On October 21, 1994—less than 60 days after the Congress had enacted the statute and before the Secretary had published the procedural regulations required by § 113(b)—16 airlines (since known as "the Original Complainants") filed a complaint under § 113(a)(1) challenging the compensatory landing fees they were paying to the City. On January 26, 1995 the Secretary accepted this complaint as timely filed, but informed the complainants that they should file an amended complaint no later than 30 days after the promulgation of the already overdue procedural rules and substantive guidelines for § 113. Those rules and guidelines were published in the Federal Register on February 3, 1995.[1] On March 2 the Original Complainants duly filed an amended complaint under the new procedural rules.

On March 7, 1995 the Secretary issued a scheduling notice. In accordance with the procedural rule providing that "[i]f an air carrier ... has previously filed a complaint with respect to the same airport fee or fees, any complaint by another carrier ... shall be filed no later than 7 calendar days following the initial complaint," 14 CFR 302, 60 Fed. Reg. 6919, 6927, the scheduling notice provid-

---

**1.** The City earlier challenged the substantive guidelines on the grounds that (1) the Department did not adequately explain the basis of the guidelines, in violation of the Administrative Procedure Act, and (2) they deny the City an adequate rate of return on its investment in aeronautical facilities, in violation of the Takings Clause of the Fifth Amendment to the Constitution of the United States. We dismissed this challenge as variously unripe and moot. See *City of Los An-*

*geles v. D.O.T.,* Nos. 95–1188, 1996 WL 397488 (1996) (unpublished decision). Because the Secretary did not rely upon the guidelines when assessing the reasonableness of the airfield rental charge, and correctly held that the airlines failed to meet their burden of proof with respect to the other challenges here at issue, see Part II.C–D below, we need not pass today upon the applicability and validity of the guidelines.

ed that follow-on complaints must be filed by March 9.

Pursuant to the procedural timetable established in the scheduling notice, 37 airlines (known, not surprisingly, as "the Follow-on Complainants") filed complaints by March 9. Although the City objected that these complaints had not been filed within the 60–day limitation period established by § 113(a)(2), the Secretary announced that he would hear the complaints pursuant to his discretionary power under the Anti–Head Tax Act and § 511 of the Airport and Airways Improvement Act together with those that had been timely filed under § 113. The Secretary also determined that there was a significant dispute over whether the increased landing fee was reasonable and on April 3 ordered the ALJ to conduct a hearing into the compensatory fee system. The ALJ held hearings and announced his recommended decision in May 1995.

The Secretary announced his final decision at the end of June 1995. He found, and the various parties now dispute, that: (1) the City's inclusion in the rate base of a rental charge based upon the fair market value of the land underlying the airfield and the apron is prohibited by law; (2) the amortization charges that the City assessed the airlines with respect to various capital assets are reasonable; (3) the airlines failed to prove that the airport generated aeronautical revenues in excess of aeronautical costs by assigning a disproportionate share of the terminal costs to the airlines; and, (4) he was authorized to award relief only to those airlines that had filed complaints within 60 days of the enactment of § 113. This decision gave each party reason to complain and it is to their complaints that we now turn.

## II. ANALYSIS

The City challenges the Secretary's determination that it may not lawfully charge a rent based in part upon the fair market value of the land underlying the airfield and the apron. The Original Complainants assert that the amortization charges approved by the Secretary constitute double charging by the airport and that the Secretary mistakenly concluded that they failed to show that the airport has generated aeronautical revenues in excess of its aeronautical costs. Finally, the Follow-on Complainants contend that the Secretary's decision not to award them relief is based upon an unreasonable interpretation of § 113 and discriminates against foreign carriers in violation of various treaties governing international aviation.

### A. Standard of Review

■ The Secretary's decision, if it is reasoned, is entitled to our deference. *See Northwest Airlines v. County of Kent*, 510 U.S. 355, 366–68, 114 S.Ct. 855, 863, 127 L.Ed.2d 183 (1994). The Secretary's findings of fact are conclusive if supported by substantial evidence, § 113(c)(6); and we will affirm his decision unless it is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

The Supreme Court has long taught, however, that an administrative decision must not be affirmed if the agency failed to exercise the discretion entrusted to it by the Congress. *SEC v. Chenery*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 462–63, 87 L.Ed. 626 (1943). More specifically, it is a well-established rule in this circuit that an agency must revisit its decision if it is "base[d] not on the agency's own judgment but on an erroneous view of the law." See *Prill v. NLRB*, 755 F.2d 941, 947 (D.C.Cir.1985); *IBEW v. NLRB*, 814 F.2d 697, 707–708 (D.C.Cir.1987).

### B. Valuation of the Land Underlying the Airfield and the Apron

■ The City included among the airfield and apron costs a rental charge based upon the fair market value of the underlying land. The City bought most of this land at an average cost of $2,427 per acre. In calculating the rental charge, however, the City used the present fair market value of the land, which it estimated at $150,000 per acre. The resulting annual rental charge totaled $14,861,900.

The Secretary concluded that basing the rental charge upon the fair market value, rather than upon the historic cost, of the underlying land resulted in the airport recov-

ering more than its "actual costs" and was therefore unlawful. The City argues that the Secretary based this decision upon a misunderstanding of the law.

The Secretary held that the Anti–Head Tax Act mandates the use of historic cost valuation to the exclusion of every other method of valuing land that is to be included in the landing fee rate base:

> Requiring an airport to base its landing fees on the historic cost of the airfield land will allow the airport to recover its actual costs. Allowing an airport to include an estimated fair market value for airfield land in the landing fee rate base will enable the airport to recover a surplus above its airfield costs, which would be contrary to law.

Final Decision at 20; *see also id.* at 24 (under Anti–Head Tax Act "airport fees [must] be justified by the airport's costs," which "mandat[es] the use of historic cost for airfield land"). Historic cost is, to be sure, one permissible measure of costs in cost-of-service rate-making. The Secretary's view of historic cost as the apodictically indicated measure of "actual cost," is not, however, supported by the applicable law.

In *Smyth v. Ames* the Supreme Court first held that the "basis of all calculations as to the reasonableness of rates ... must be the fair value of the property being used ... for the convenience of the public." 169 U.S. 466, 546, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898). When it later overruled *Smyth,* however, the Court did not rule fair market value out of cost-of-service rate making; it held only that "[t]he Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas." *FPC v. Natural Gas Pipeline,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942). Administrative convenience and the lack of precision introduced by a fluctuating rate base, the Court concluded, may justify the use of historic cost rather than current fair market value for the purpose of rate-making. See *Duquesne Light Co., v. Barasch,* 488 U.S. 299, 308–09, 109 S.Ct. 609, 615–16, 102 L.Ed.2d 646 (1989); *See also* I Alfred E. Kahn, *The Economics of Regulation* 41 (1970) ("[T]he transformation of the rate base by most state

commissions from a hypothetical or imaginary to an actual book figure, representing actual money outlays, introduced a strong element of stability and predictability into the regulatory process").

Nor has the Court ever held that historic cost represents the only true measure of cost and the Secretary points to no law, regulation, or agency decision to that effect. On the contrary, agencies that regulate utility rates have recognized "opportunity cost" as a factor to be considered when setting rates designed to cover the actual costs incurred to provide a particular service. *See, for example, Pennsylvania Elec. Co.,* 60 F.E.R.C. ¶ 61,034, 61,120 & n. 1 (1992), *aff'd sub nom. Pennsylvania Elec. Co. v. FERC,* 11 F.3d 207 (D.C.Cir.1993) (opportunity cost relevant to Energy Policy Act requirement that rates "ensure that, to the extent practicable, costs incurred ... are recovered"). Economists, too, have argued that opportunity costs should be considered in ratemaking. *See* William J. Baumol and J. Gregory Sidak, *Transmission Pricing and Stranded Costs in the Electric Power Industry* 139 *et seq.* (1995).

The Secretary was apparently of the view that an opportunity cost is not an "actual cost," in law or in economics, because it does not appear as a cash expenditure in the account books of the airport. Nothing in the Anti–Head Tax Act or § 113, however, prescribes an accounting rather than an economic conception of cost in airport ratemaking. We must, therefore, remand this aspect of the Secretary's decision for his fuller consideration of the respective merits of the historic cost and fair market value methodologies here at issue. See *Chenery,* 318 U.S. at 94– 95, 63 S.Ct. at 462–63; *Prill,* 755 F.2d at 947; *IBEW v. NLRB,* 814 F.2d at 707–708.

As detailed below, the Secretary did make other findings in support of his conclusion that valuing the airfield land based upon any measure of cost other than historic cost would be "contrary to law." In light of the Secretary's fundamental misunderstanding of the governing law, however, we cannot afford those findings dispositive significance; for we cannot say that the Secretary would have drawn the same conclusion had he had only

those findings upon which to rely. Still, in order to avoid a useless round of litigation, we consider those other findings now in order to determine whether they would support the Secretary in adhering to his original decision on remand.

First, the Secretary observed that airports that use residual methodologies have also used historic cost. That the use of historic cost is reasonable under a residual fee regime does not, however, demonstrate that its use is uniquely indicated under a compensatory regime. LAX was, as the Secretary noted, the first airport to switch from a residual to a compensatory methodology. Not surprisingly, therefore, the Secretary had never before confronted the question of how properly to measure cost under a compensatory fee regime. The Secretary should confront this question directly on remand.

Second, the Secretary found that the use of fair market valuation could create practical difficulties not entailed by the use of historic cost valuation:

> [W]hen the estimate of fair market value is based on land adjoining the airport, the estimate uses land parcels whose value is greatly influenced by their location near the airport, which can lead to "bootstrap" accounting. If the estimate is based on land that is not near the airport, as the City claims was done in its estimate, the validity of the estimate will depend on whether the land used for the calculation is comparable to the airfield land, an issue which may be difficult to resolve.

Final Decision at 21. As the Secretary acknowledged, however, the airlines have never contested the accuracy of the appraisal obtained by the City in this case. Nevertheless, the Secretary reasoned (*id.*) that:

> [A]llowing airport operators to use the airfield land's fair market value in a landing fee rate base will make it more difficult for us to assess the reasonableness of landing fees. The Supreme Court, moreover, has noted that regulatory agencies abandoned the use of fair market value as the means of valuing capital investments by public utilities due to the difficulties of calculating fair market value. *Duquesne Light Co. v.*

*Barasch,* 488 U.S. 299, 308–309, 109 S.Ct. 609 [615–16], 102 L.Ed.2d 646 (1989).

The difficulties to which the Supreme Court referred in *Duquesne* are not necessarily present in this or any particular airport case. Determining the present value of utility plant and equipment was especially difficult inasmuch as "a utility's assets, such as power plants, could not be set by a market price because such assets were rarely bought and sold." *Duquesne,* 488 U.S. at 309, n. 5, 109 S.Ct. at 616, n. 5. The process of valuing utility plant and equipment was further vexed by the necessity of taking into account any technological changes that may have occurred since it was built, and of doing so again and again in periodic ratemaking proceedings. As a result, the process "usually degenerated to proofs about how much it would cost to reconstruct the asset in question, a hopelessly hypothetical, complex, and inexact process." *Id.,* paraphrasing Justice Brandeis' dissent in *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission,* 262 U.S. 276, 292–94, 43 S.Ct. 544, 548–49, 67 L.Ed. 981 (1923). Valuing land does not present the same difficulties: there is no need to reconstruct a hypothetical asset in order to account for technological changes, and there is often (indeed, perhaps usually) a ready market in parcels sufficiently comparable for a professional appraiser to extrapolate with some confidence.

Moreover, the Secretary appears to have assumed, but there is no record evidence to suggest, that the airport intended to recalculate its rate base periodically in order to capture increases in the market value of the underlying land; for all that appears in the record, however, the City would appraise the market value of the land only once, *i.e.,* for the purpose of bringing that land into the rate base. To apply the lesson of *Duquesne* and its forebears to this case, therefore, without further explanation and analysis and without any inquiry into the relevant differences between the uses being made of fair market value in each context, was arbitrary and capricious.

On remand, the Secretary should give express consideration to the City's arguments in support of market valuation, which he did

not address before presumably because he thought he was bound by the statute to use the historic cost approach. Specifically, the City argued, and presented the testimonial evidence of Professor Kenneth Arrow, a Nobel laureate in economics, to the effect that the methodology it adopted for LAX would cause the landing fees paid by the airlines to reflect the true cost of the airfield land; namely, "the value [the City] could have obtained in the best alternative use." See *Declaration of Kenneth J. Arrow*, ¶¶ 6–10 (March 13, 1995). This would, the City maintained, ensure that the actual costs of the airfield are borne by those receiving the benefits of the airfield and would create the proper incentive for the City to allocate land to airport use.

In sum, the Secretary was mistaken in his belief that the reference in § 113 to "actual costs" requires the use of historic cost in this case. We therefore remand the matter for his further consideration of the respective merits of the historic cost and fair market valuation methodologies in the present circumstances.

### C. Amortization and Imputed Interest Charges

█ The costs attributed to the apron and airfield cost centers include amortization of certain capital assets acquired while the residual fee system was in use. The Original Complainants maintain that they are being charged twice for these assets: all the money collected under the residual fee system went into a single "pot" and the money used to pay for these assets must have come out of that pot. Therefore, so the argument goes, to charge the airlines for amortization would be to charge them again for assets that were bought in the first place with money that they supplied.

The Secretary determined that these amortization charges were properly assessed against the airlines because their purchase was never included as a line-item cost during the era of the residual fee:

> If a cost item was not included in the fee calculation during the period of residual fees, then the airport would not be getting paid twice if it included the cost in the rate base under the compensatory fee system. Thus, if the airport always treated the purchase as capital expenses which would be amortized over a period of time, then the cost of those assets was never included as an expense in the rate base under the residual fee system (except to the extent that part of the cost was amortized during that period), so that no airport user paid those costs.

Final Decision at 27.

The airlines challenge this determination, arguing that the cost of acquiring these assets was included as a line-item expense in the form of a "debt service charge." The airlines explain that in order to ensure that the interests of bondholders were adequately protected, the City of Los Angeles passed an ordinance that required LAX to generate total revenues that exceeded total costs by an amount equal to 25 percent of the airport's annual debt service. The charge, which ensured that this requirement was met, was included as an expense to be covered when setting the landing fee at LAX each year. The debt service charge was thus collected annually but, the airlines maintain, never actually used by the airport to service its debt. The airlines contend that these funds must, therefore, have been used to pay for any capital assets the airport purchased.

The airlines have pointed to a stream of revenue that the airport apparently collected each year under the *ancien régime*, but they have not linked this revenue to any corresponding expenditure for capital assets. Although the airlines have certainly shown that they were charged to provide a level of comfort to bondholders, they have not shown that they were charged for the capital assets for which they are now being charged amortization. The Secretary rightly concluded, therefore, that they have failed to meet their burden of proof.

The airlines also claim that the inclusion of imputed interest charges for airfield and apron improvements, facilities, and equipment violates the Policy Statement adopted by the Department in satisfaction of the requirement that the Secretary publish guidelines to be used "in determining ... whether

any airport fee is reasonable." § 113(b)(2). The Policy Statement strongly implies that an airport may not include in its rate base imputed interest charges with respect to an asset for which the airlines provided the purchase money. § 2.3.1, 60 Fed.Reg. at 6916.

Again, however, the Secretary concluded that the airlines simply did not carry their burden of proof with respect to the source of the funds used to acquire capital assets:

[The complainants] are obliged to show that the funds used to purchase the assets came from aeronautical sources, which they have failed to do. In reviewing the record, we found no evidence that aeronautical sources provided the funds at issue.

Final Decision at 29.

We agree that the airlines failed to carry their burden of proof. The airlines do not even purport to identify any evidence in the record indicating that the funds used to purchase these assets were derived from aeronautical sources.

### D. Aeronautical Revenues from Non-airfield Sources

■ The airlines maintain that the City attributed an excessive share of the terminal costs to them. Their point is that the airport collected more from the airlines than it spent providing services to the airlines, whereas the Secretary had announced in the Policy Statement that both the Anti–Head Tax Act and § 511 of the Airport and Airway Improvement Act require that "revenues from aeronautical fees ... not exceed the costs to the airport proprietor of providing airport services and facilities currently in aeronautical use." Policy Statement ¶ 2.1, 60 Fed. Reg. 6906, 6916 (February 3, 1995); *see also New England Legal Foundation v. Mass. Port. Auth.,* 883 F.2d 157 (1st Cir.1989). *Cf.* Proposed Policy Regarding Airport Rates and Charges, ¶ 2, 60 Fed.Reg. 47012, 47017 (September 8, 1995) (eliminating requirement that aeronautical revenues not exceed aeronautical costs).

Yet again the Secretary found that the airlines failed to carry their burden of proof. The expert witness for the airlines testified that terminal-related aeronautical revenues exceeded terminal-related aeronautical costs by $8.4 million, but the Secretary found this testimony unreliable. The expert admitted on cross-examination that he overestimated terminal-related aeronautical revenues by more than $5 million. Final Decision at 54. By reallocating access costs away from the airfield and terminal, the expert also underestimated aeronautical costs by at least $2.1 million. Finally, the expert's failure to base his own allocation of terminal costs upon any rigorous study infected his analysis with a degree of uncertainty that the Secretary reasonably found unacceptable:

His assumption [that the terminal was split evenly between aeronautical and non-aeronautical uses] was not based upon any formal study. His calculated cost estimates, however, would change significantly if the amount of terminal space actually occupied by the airlines was a little larger than his fifty percent estimate. In fact, the expert admitted that his estimated revenue surplus would shrink by $1 million for each percentage point by which the airlines' share of the terminal space was greater than fifty percent. As a result, if the expert's estimate of aeronautical space was too low by eight percent, that would eliminate the entire aeronautical revenue surplus, even if his calculations contain no other errors. And the record indicated that the expert's estimate was almost certainly too low.

Final Decision at 35.

The airlines do nothing to blunt the Secretary's critique of their expert's testimony and offer no argument suggesting that the Secretary erred in concluding that they failed to meet their burden of proof. We therefore hold that the Secretary's decision upholding the City's allocation of terminal costs was not arbitrary and capricious.

### E. Dismissal of the Follow–On Complaints

■ The Secretary concluded that he was not authorized to award the Follow-on Complainants relief under § 113 because they did not file their complaints within 60 days of the enactment of the statute. Final Decision at

58–60. The airlines argue that the Secretary's decision is "arbitrary, capricious, and contrary to the purpose of [§ 113]" because it does not afford each party that has been aggrieved by the fee increase at LAX a reasonable opportunity to file a complaint under § 113.

The Congress enacted § 113, creating the expedited procedure under which this action was heard by the Department of Transportation, on August 23, 1994. The statute makes this expedited procedure available only to an airline that files a written complaint within 60 days of receiving notice of a landing fee increase. § 113(a)(1).

As we have seen, the Original Complainants filed their complaint on October 21, 1994; the Secretary accepted that complaint on January 26, 1995 and instructed the airlines to file an amended complaint within 30 days of the promulgation of the procedural rules implementing § 113. Those rules were promulgated on February 3, 1995 and the Original Complainants filed an amended complaint on March 2, 1995.

The procedural rules provide that, while a follow-on complaint must be filed within seven days of the filing of an initial complaint, this seven-day period for filing a follow-on complaint does not extend the 60–day statutory period for filing any complaint. 60 Fed. Reg. 6919, 6927, 14 C.F.R. § 302.603(b) (in order to be considered under § 113, "all complaints ... must be filed on or before the 60th day after the carrier receives written notice of the imposition of the new fee or the imposition of the increase in the fee"). Therefore, when the Department issued a scheduling notice on March 7, 1994 providing that "[c]omplaints by other carriers" were to be filed no later than seven calendar days after the Original Complainants had filed their amended complaint, it did not thereby extend the time for filing under § 113.

When, on March 9, 37 airlines filed follow-on complaints, and the Secretary accepted them even though they were not filed within 60 days of the enactment of § 113, he did not suggest that he had the authority to grant retrospective relief to the Follow-on Complainants under § 113. See Instituting Order at 19, n.14. Rather, he accepted those complaints purely as a discretionary matter under the Anti–Head Tax Act and § 511 of the Airport and Airways Improvement Act, which authorize the Secretary to rule prospectively upon the reasonableness of an airport fee:

> We have the authority to adopt procedures for investigating the reasonableness of airport fees under our general authority to enforce the reasonableness requirement established by 49 U.S.C. 47107 and 49 U.S.C. 40116.... If we did not accept the follow-on complaints in this proceeding, those carriers would have the right to file a complaint with the FAA against the City under Part 13 of the FAA's rules. Such a result would be illogical.

Instituting Order at 20. In his Final Order of June 30, 1995 the Secretary reiterated that the Follow-on Complainants were entitled only to a prospective ruling upon the reasonableness of the fee increase at LAX. The Secretary explained that, although he had the discretion to hear the follow-on complaints together with the original complaints, he had the authority to award retrospective relief under § 113 only to those airlines that filed timely complaints; he could not "excuse carriers from complying with the statute's requirement that complaints be filed within sixty days." Final Decision at 59.

The Follow-on Complainants challenge the Secretary's determination principally on the ground that this is an unreasonable interpretation of § 113 because it is not "fair to all concerned." The Follow-on Complainants are silent as to how precisely they would have had the Secretary interpret § 113. It appears, however, that by their lights an interpretation would be fair to all only if it afforded equal access to the expedited procedure of § 113 for the diligent and lax alike.

Be that as it may, we review the Secretary's interpretation pursuant to *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–844, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). First, we must determine whether the Congress has spoken directly to the question of how § 113 applies to a complaint challenging a fee increase that was announced prior to the enactment of the stat-

ute. *Id.* If it has, then our inquiry is at an end "for the court, as well as the agency, must given effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If it has not, however, then the Congress has implicitly delegated interpretive authority to the agency, and the court must uphold the agency's interpretation if it is consistent with the statutory scheme. *Id* at 844, 104 S.Ct. at 2782–83.

Section 113(a)(1) provides that a carrier must file a "written complaint" challenging a fee increase under that statute "within 60 days after such carrier receives written notice of the establishment of or increase of such fee." At first glance, therefore, § 113 seems to bar the present action altogether because the Original Complainants did not (and could not, for § 113 did not then exist) file within 60 days of being notified of the proposed fee increase in late June of 1993. Upon closer inspection, however, we see that § 113(e)(3) states that the new procedure may not be used to challenge an "existing fee not in dispute as of such date of enactment," which strongly suggests that an airline is permitted to file a complaint under the new procedure against a fee increase announced more than 60 days before the enactment of § 113 provided that the fee increase remained in dispute on the day of enactment. In any event, no party to this dispute maintains that the 60–day limitation period was intended to bar an airline from complaining under § 113 about a fee increase that was announced more than 60–days before the enactment of the Act.

It appears, moreover, that the Congress enacted § 113 in direct response to the dispute over the fee increase at LAX, *see, for example,* 139 Cong. Rec. H7573, H7578 (Oct. 7, 1993) (Remarks of Rep. Clinger), and that the Congress specifically intended that the airlines be able to use the newly-created procedure to challenge the LAX fee increase. *See, for example,* 140 Cong. Rec. S6988, S6988 (June 16, 1994) (Remarks of Sen. Feinstein, noting that "the airlines would be permitted to file a 120–day administrative proceeding with respect to" the fee increase at LAX and further remarking that the Act was amended with the specific purpose of ensur-

ing that the "standstill agreement" between the airlines and the City would not be disturbed should the airlines file a complaint under § 113); *id.* (remarks of Senator Ford, describing Senator Feinstein's understanding as "complete and accurate").

The Secretary acknowledged the tension between the 60–day limitation period and the apparent intent of the Congress regarding this very dispute as follows:

> The statute expressly requires that complaints be filed within sixty days of the date that a carrier receives notice that the airport is increasing a fee or imposing a new fee. § 113(a)(1)(B). However, as shown, Congress clearly intended the statute to apply to the on-going dispute about the reasonableness of the LAX landing fees, even though those fees had been imposed well before the statute's enactment.

Final Decision at 59. In light of this tension, the Secretary concluded that the statute does not speak to the question of how it applies to a fee increase predating enactment of the statute and still in dispute on that date. We agree with the Secretary, as do the petitioners.

The disputed question is whether the Secretary's interpretation is "a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. Section 113 was enacted generally in order to provide an expedited procedure for challenging any increase in any airport landing fee in dispute then or in the future. The Congress intended specifically that the airlines be able to use this expedited procedure to challenge the 1993 landing fee increase at LAX. The Follow-on Complainants assert, therefore, that the Secretary failed to give effect to the intent of the Congress when he interpreted § 113 in a way that prevented them from using it to challenge the 1993 landing fee increase.

We think the Secretary adopted an interpretation of the statute that strikes a reasonable balance between two competing congressional aims. As he said at the time:

> To reconcile Congress' intent to allow the airlines to challenge the LAX fees under [§ 113] and the express requirement of a 60 day filing deadline for complaints, we

construed the statute as requiring the filing of a complaint about the LAX fees within sixty days of the statute's enactment.

*Final Decision* at 59. We cannot say that the Secretary's reconciliation of these two congressional intentions is unreasonable or based upon an impermissible construction of the statutory scheme. We cannot say even that § 113(a) did not, in and of itself, provide adequate notice to the airlines of the need to file their complaints within 60–days of enactment of the statute. We therefore hold that the Secretary's interpretation of § 113(a)(1)(B) is a permissible response to the silence of the statute, and one to which we must presumptively defer.

Nonetheless, the Follow-on Complainants argue that the Secretary's interpretation should be afforded little deference because he did not announce his interpretation before issuing his Final Decision on June 30, 1995. They claim that they were led to believe that their complainants would be accepted when the Secretary announced that follow-on complaints should be submitted no later than March 9, 1995. They accuse the Secretary, in short, either of having changed his interpretation of § 113 at the end of the administrative proceeding or of having concealed from the outset, for some unknown reason, his true intention to deny the Follow-on Complainants a remedy.

But the Secretary was neither so fickle nor so foul. He consistently maintained that compliance with the 60–day limitation period is a *sine qua non* for receiving relief under § 113. The procedural rules are quite clear about the force of the 60–day limitations period. 60 Fed.Reg. 6919, 6927, 14 C.F.R. § 302.603(b). The Secretary noted in his order accepting the original complaint that there was a dispute over whether the 60–day filing period "should be applied to begin on the date of enactment." Order 95–1–42, 4 (January 30, 1995). The Secretary accepted the original complaint under § 113 only because "the complainants filed a timely complaint by filing their initial complaint within 60 days of the statute's enactment." Order 95–4–5, 14 (April 3, 1995). At no point, moreover, did the Secretary suggest that he could accept or that he had accepted the follow-on complaints pursuant to his authority under § 113. Rather, the Secretary stated that he was accepting the follow-on complaints as an exercise of his discretion under 49 U.S.C. § 47107 and 49 U.S.C. § 40116. *Id.* at 19 & n. 14. Any suggestion that the Secretary somehow misled the Follow-on Complainants, or that he altered or first adopted his interpretation of § 113 only at the end of the administrative proceeding, is therefore unfounded.

The Follow-on Complainants also argue that the Secretary's interpretation of the 60–day limitation period constitutes a retroactive application of a substantive statutory provision that cuts off their right to a refund. The airlines here rely upon the Fifth Circuit's decision in *Hartford Casualty Insurance v. FDIC*, 21 F.3d 696 (1994), which involved a newly enacted statutory provision that cut off a pre-existing right. Section 113, in contrast, created a new statutory right conditioned upon meeting a set of newly adopted procedural requirements for filing a complaint. The Follow-on Complainants did not comply with these requirements. As a result, they never acquired any rights that the Secretary's interpretation could cut off.

The Follow-on Complainants also challenge the Secretary's interpretation and application of § 113 on the ground that it discriminates against foreign carriers, in violation of various treaties requiring that foreign airlines receive national treatment. *See, for example, Convention on International Civil Aviation,* opened for signature Dec. 7, 1944, art. 15, 61 stat. 1180, 15 U.N.T.S. 295, T.I.A.S. No. 1591 (ratified by the United States on August 9, 1946) (providing that "every airport ... which is open to public use by ... national aircraft shall likewise ... be open under uniform conditions to the aircraft of all other contracting States"). These treaties do forbid discrimination against foreign carriers, but the Secretary has done nothing to single out foreign carriers for discriminatory treatment. Every foreign carrier that filed a timely complaint, such as Varig Brazilian Airlines, received the same treatment as its domestic counterparts, while every untimely complaint, such as that of the domestic carri-

er Tower Air, was dismissed without regard to the national origin of the complaining airline.

■ Finally, the Follow-on Complainants maintain for the first time on appeal that the Secretary should have enforced the terms of the "standstill agreement" entered into between the airport and some of the airlines. That argument, however, is not properly before the Court because it was not raised before either the ALJ or the Secretary. See § 113(c)(6) ("No objection ... shall be considered by the court unless [the] objection was urged before an administrative law judge or the Secretary").

### III. CONCLUSION

The Secretary based his analysis of the valuation methodology adopted by the City upon the erroneous assumption that § 113 prohibits the City from including in the landing fee a rental charge reflecting the fair market value of the land underlying the airfield. As a result of this error, the Secretary did not give adequate consideration to the alternative fee methodology proposed by the airport.

The Original Complainants failed to show that the cost of acquiring the assets for which the City assessed them amortization charges had been paid by the airlines under the residual fee agreements in force prior to 1993. The airlines also failed to show that the airport was receiving terminal-related aeronautical revenues in excess of its terminal-related aeronautical costs.

Finally, we conclude that the Secretary permissibly determined that he had no authority under § 113 to award relief to the Follow-on Complainants, who did not file their complaints within 60 days of the enactment of § 113. The Secretary's interpretation of that provision was reasonable and the application of the 60–day limitation period to the Follow-on Complainants neither deprives them of a vested right nor constitutes discrimination against foreign carriers.

For the foregoing reasons we deny the petitions of the Original Complainants and of the Follow-on Complainants and grant the petition of the City. We remand this matter for the Secretary to consider the City's proposed valuation methodology.

*So ordered.*