United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued May 15, 1997 Decided August 1, 1997 

 No. 96-1253

 Air Transport Association of America, 

 Petitioner

 v.

 Department of Transportation, et al., 

 Respondents

 City of Los Angeles, 

 Intervenor

 Consolidated with

 No. 96-1269

 On Petitions for Review of Orders of the 

 United States Department of Transportation

 Walter A. Smith, Jr. argued the cause for petitioner Air 
Transport Association of America, with whom Allen R. Sny-


der, Jonathan L. Abram, and Jonathan S. Franklin were on 
the briefs.

 Steven S. Rosenthal argued the cause for petitioner City of 
Los Angeles, with whom Ronald N. Wilson, Stanley A. 
Zamel, Ardis M. Conant, Leilani F. Battiste, and Breton K. 
Lobner were on the briefs. G. Brian Busey entered an 
appearance.

 Thomas L. Ray, Attorney, United States Department of 
Transportation, argued the cause for respondents, with whom 
Nancy E. McFadden, General Counsel, and Paul M. Geier, 
Assistant General Counsel, were on the brief. Marion L. 
Jetton and Robert B. Nicholson, Attorneys, United States 
Department of Justice, entered appearances.

 Steven S. Rosenthal, Ronald N. Wilson, Stanley A. Zamel, 
Ardis M. Conant, Leilani F. Battiste, and Breton K. Lobner, 
Attorneys, City of Los Angeles Department of Airports, filed 
the brief for intervenor City of Los Angeles. G. Brian Busey 
entered an appearance.

 Allen R. Snyder, Walter A. Smith, Jr., Jonathan L. 
Abram, and Jonathan S. Franklin filed the brief for interve-
nor Air Transport Association of America.

 Scott P. Lewis and Kenneth W. Salinger filed the brief for 
amici curiae Airports Council International-North America 
and American Association of Airport Executives. Patricia A. 
Hahn entered an appearance.

 Before: Silberman, Ginsburg, and Henderson, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Silberman.

 Silberman, Circuit Judge: Petitioners City of Los Angeles 
and the Air Transport Association of America, an airline 
trade association, each challenge the Department of Trans-
portation's Final Policy Regarding Airport Rates and 
Charges. We grant the petitions for review and remand.

 I.

 Airports are required by statute to charge aeronautical


users reasonable fees.1 Section 511 of the Airports and 
Airways Improvements Act, codified at 49 U.S.C. s 47107 
(1994), requires an airport that accepts federal grant money 
(or land) to assure that the airport will be available for public 
use on reasonable conditions and without unjust discrimina-
tion; this assurance has been interpreted to include a re-
quirement that the airport's fees be reasonable. See New 
England Legal Found. v. Massachusetts Port Auth., 883 F.2d 
157, 169-70 (1st Cir. 1989). Similarly, the Anti-Head Tax Act 
allows a publicly owned airport to collect only reasonable 
landing fees and charges from aeronautical users. See 49 
U.S.C. s 40116(e)(2) (1994); Northwest Airlines v. County of 
Kent, 510 U.S. 355, 366 (1994). Although the Department of 
Transportation (DOT) has adjudicated disputes over the rea-
sonableness of airport fees under these statutes, see, e.g., New 
England Legal Found., 883 F.2d at 163-66, until recently it 
never promulgated regulations defining what it thought to be 
reasonable airport fees. Airlines and airports did, however, 
take these issues to court. See, e.g., Northwest Airlines, 510 
U.S. 355; New England Legal Found., 883 F.2d 157; India-
napolis Airport Auth. v. American Airlines, 733 F.2d 1262 
(7th Cir. 1984), disapproved by Northwest Airlines.

 In August 1994, Congress enacted s 113 of the Federal 
Aviation Administration Authorization Act, codified at 49 
U.S.C. s 47129 (1994), which required the Secretary of Trans-
portation to publish "final regulations, policy statements, or 
guidelines establishing--... the standards or guidelines that 
shall be used by the Secretary in determining under this 
section whether an airport fee is reasonable." Id. 
s 47129(b)(2). That section also created an expedited admin-
istrative procedure in which an airline may challenge before 
the Secretary the reasonableness of an airport fee. See City 
of Los Angeles Dep't of Airports v. Department of Transp., 
103 F.3d 1027, 1030 (D.C. Cir. 1997) (LAX I). In such 

__________
 1 Airports collect the bulk of their revenues from two general 
groups of users: aeronautical users, such as commercial (passenger) 
airlines, and non-aeronautical concessionaires, including car rental 
agencies, parking lots, restaurants, gift shops, and other small 
vendors.


proceedings, only the reasonableness of the challenged fee is 
open to question; the Secretary "shall not set the level of the 
fee." 49 U.S.C. s 47129(a)(3).2

 The Secretary adopted an "Interim Policy" in February 
1995 which required that aeronautical fees be capped by the 
cost to airports of providing aeronautical facilities and ser-
vices. The interim policy also required that airfield assets be 
valued at their historic cost in determining the total costs that 
could be recovered from fees. Airports complained that the 
Interim Policy would force them to change their operating 
methods and would damage their ability to finance improve-
ments, since they had commonly based fees for certain aero-
nautical facilities (such as terminals) on something other than 
historic cost.

 In June 1996, after receiving comments on a "Supplemental 
Proposed Policy," the Secretary published a regulation enti-
tled the "Final Policy Regarding Airport Rates and Charges." 
The Final Policy, unlike the Interim Policy, distinguishes 
between airfield and non-airfield fees. For airfield fees--
aeronautical fees charged for the use of the runways, taxi-
ways, ramps, aprons, and roadway land--the Final Policy 
maintains the Interim Policy's requirements that aeronautical 
fees be capped at actual cost to the airport, and that airfield 
assets be valued according to their historic cost. For non-
airfield fees--aeronautical fees charged for the use of all 
other aeronautical facilities and services, including terminals, 
hangars, cargo space, and maintenance--the Final Policy 
instead permits airports to use "any reasonable methodolo-
gy."

 According to the Secretary, requiring that assets be valued 
at historic cost in setting airfield fees is consistent with 
current practice, permits airports to recover their out-of-
pocket costs, and, since historic cost is easily determined from 

__________
 2 Section 113 permits airports to choose either a residual fee 
methodology, a compensatory fee methodology, or any combination 
of the two. Id. s 47129(a)(2).


accounting records, will help avoid controversies and be easi-
er to administer. The Secretary rejected fair market valua-
tion as a methodology for valuing assets in determining 
airfield fees because the Secretary thought that airports do 
not have "opportunity costs" in airfield assets since they are 
committed to continued operations. The Secretary also 
thought that the Final Policy's treatment of non-airfield fees 
is consistent with past practice (which had not resulted in 
disputes), and would permit pricing to reflect the differences 
among non-airfield facilities. The Secretary believed it un-
likely that airports can or will exercise market power in 
setting non-airfield fees.

 The Final Policy also permits airports to include in airfield 
fees a charge for imputed interest on those aeronautical funds 
reinvested in the airfield, unless the invested funds derive 
from airfield fees. A charge for imputed interest, according 
to the Secretary, lets airports recover their opportunity costs 
in the airfield (if any) and compensates for inflation. But 
imputed interest cannot be charged for airfield revenues 
reinvested in the airfield because the Secretary believes 
airfield users might then be financing airfield investment 
twice: once in the form of otherwise reasonable airfield fees 
that turned out to generate excess revenue, and once on the 
imputed interest charge on the investments made with that 
revenue.

 Petitioners attack the Final Policy from both sides. The 
Air Transport Association of America (ATA), on behalf of its 
members, challenges what it sees as the Final Policy's com-
plete deregulation of non-airfield fees. The City of Los 
Angeles challenges the Final Policy's requirement of historic 
cost for airfield fees.

 II.

 Anterior analytically to the main dispute between the two 
petitioners and the Secretary--whether the regulation's 3 dis-
parate treatment of airfield and non-airfield fees is arbitrary 

__________
 3 Although he calls it a Final "Policy," the Secretary has clearly 
promulgated a rule.


and capricious under the Administrative Procedure Act 
(APA)--is the nature of the Secretary's authority and obli-
gation to issue regulations (guidelines) which set forth a 
particular methodology for determining the reasonableness of 
fees. Los Angeles contends the Secretary has no such power, 
whereas ATA claims that not only does he have that authori-
ty, he must use it in a meaningful manner for both airfield 
and non-airfield fees.

 Los Angeles argues that the statute obliges the Secretary 
to take a relatively passive role: he "may only determine 
whether [a] fee is reasonable or unreasonable and shall not 
set the level of the fee." 49 U.S.C. s 47129(a)(3). Emphasiz-
ing the differences that exist among airports regarding air-
field and non-airfield facilities and financial structures, it 
contends that Congress, understanding those differences, in-
tended that the Secretary's role be limited to determining 
whether a particular airport's fees meet an overall (bottom 
line) reasonableness standard. Cf. Federal Power Comm'n v. 
Natural Gas Pipeline Co., 315 U.S. 575, 586 (1942). Each 
airport is therefore entitled to use any reasonable methodolo-
gy, and the Secretary lacked authority to require airports to 
use historic cost as a basis for airfield fees.

 We think Los Angeles' position on this issue is not very 
persuasive. Section 113, it will be recalled, obliges the Secre-
tary to publish "final regulations, policy statements, or guide-
lines establishing--... the standards or guidelines that shall 
be used by the Secretary in determining under this section 
whether an airport fee is reasonable." 49 U.S.C. 
s 47129(b)(2). That provision certainly implies that Congress 
intended the Secretary to fashion a quasi-legislative uniform 
approach to measuring the reasonableness of airport fees. 
That the Secretary is not authorized actually to set the fee 
itself means that each airport necessarily has some discretion 
in the application of the Secretary's guidelines, but it hardly 
can be read to mean that the Secretary was not authorized to 
require a particular methodology for all airports--so long as 
that methodology is itself reasonable.


 The more difficult question, posed by ATA, is whether the 
Secretary's approach to non-airfield fees meets its obligation 
under s 113. The Secretary's "guideline" seems to be miss-
ing a "line." The regulation merely states that any reason-
able methodology will serve as a basis for non-airfield fees. 
That concept does not seem to add much--if anything--to the 
statutory requirement that airport fees be reasonable.4 It 
may well be that the Secretary is not required to insist on a 
single methodology. Perhaps he could indicate that several 
different methodologies, depending on the circumstances, 
would be authorized. We need not decide whether the Secre-
tary's treatment of non-airfield fees actually violates his stat-
utory obligation to set forth guidelines, however, because as 
will be seen, we conclude that in any event his approach is 
arbitrary and capricious.

 III.

 Even if the Secretary's regulation as applied to non-airfield 
fees satisfied s 113's publication obligation, ATA asserts that 
it amounts to de facto deregulation of those fees--permitting 
airports to use their market power to charge airlines exces-
sive amounts. Not surprisingly, ATA wants the Secretary's 
guidelines for valuing assets in determining airfield fees, 
based on historic cost, extended to the non-airfield facilities. 
ATA complains that DOT has not imposed any sort of mean-
ingful restraint on non-airfield revenues, leaving fees to be set 
by the market. That posture, it is argued, is by definition 
inconsistent with the reasonableness requirement in the Anti-
Head Tax Act, and violates the Secretary's duty under s 113. 
ATA claims that it is well accepted that an agency responsible 
for ensuring reasonable rates in industries with anticompeti-
tive conditions may not rely on the market to accomplish that 
goal. See, e.g., Federal Power Comm'n v. Texaco, Inc., 417 
U.S. 380, 397-99 (1974); Farmers Union Cent. Exch. v. 
FERC, 734 F.2d 1486, 1509-10 (D.C. Cir.), cert. denied, 469 

__________
 4 Theoretically, we suppose it might preclude a fee from being 
thought reasonable, no matter what its amount, if it is reached 
through a capricious methodology.


U.S. 1034 (1984); cf. Elizabethtown Gas Co. v. FERC, 10 F.3d 
866, 870 (D.C. Cir. 1993). Certainly that is so regarding non-
airfield fees because, according to ATA, airports enjoy virtu-
ally the same market power over non-airfield services--
terminals, hangers, cargo space maintenance, etc.--that they 
do over the airfields. At minimum, therefore, the distinction 
drawn by the Secretary between the charges for the two 
types of assets is arbitrary and capricious.

 If ATA is correct that the Secretary's regulation imposes 
no real restraint on airport charges for non-airfield assets and 
that airports exercise the same, or virtually the same, market 
power over those assets, then it seems to us that the Secre-
tary's tight regulation of airfield fees--tying them to assets 
valued at historic cost and capping them at actual cost--is 
something of an illusion. Most aeronautical users, it would 
seem, need both landing fields and non-airfield services. The 
entire package usually is sold to aeronautical users in one 
overall fee. Under the "one lump" theory of antitrust law--
the proposition that there is only one monopoly rent to be 
gained from the sale of an end product, see Western Re-
sources, Inc. v. STB, 109 F.3d 782, 784 (D.C. Cir. 1997) (citing 
3 Phillip Areeda & Donald F. Turner, Antitrust Law 
s 725b, at 199 (1978))--any market power that an airport 
wants to exercise over airfield fees theoretically may be 
exercised by increasing the non-airfield portion of the fee.

 The Secretary takes no position on the question whether 
airports have market power over non-airfield facilities, but it 
is his belief that even if an individual airport does have such 
power, it will not use it. His explanation, set forth in the 
basis for the Final Policy and in the briefs before us, is that 
publicly owned airports do not seek to maximize profits 
because they do not have the same economic incentives as 
private investors. And airport authorities may not divert 
revenues from airports to fund general government facilities, 
so there is little reason to charge airlines excessive prices. 
Moreover, even if an airport authority had a desire to build 
the world's fanciest airport, see Indianapolis Airport Auth., 
733 F.2d at 1268, it would be somewhat constrained by 
competition among airports, at least to be the location of 
passenger and cargo hubs.


 The Secretary thought past experience supported this posi-
tion: that negotiations for non-airfield fees had not generated 
controversies, and non-airfield fees had typically produced 
reasonable results by agreement between airlines and the 
airports. But as ATA observes, past litigation had sometimes 
involved total airport fees, combining both airfield and non-
airfield fees. See Northwest Airlines v. County of Kent, 738 
F. Supp. 1112, 1115 (W.D. Mich. 1990), aff'd, 955 F.2d 1054 
(6th Cir. 1992), aff'd, 510 U.S. 355 (1994); cf. Indianapolis 
Airport Auth., 733 F.2d at 1265. Be that as it may, experi-
ence prior to the Secretary's regulation is not a particularly 
reliable guide since airports may well have thought that the 
statutory limitation (reasonableness) on all airport fees prior 
to 1994 implied some sort of cost-based methodology. See, 
e.g., New England Legal Found., 883 F.2d at 169; Indianap-
olis Airport Auth., 733 F.2d at 1271. For the first time, as 
ATA points out, the Secretary's regulation, allowing any 
reasonable methodology, gives airports much greater assur-
ance that they are free to charge more for non-airfield fees, 
and there is little reason to expect they will not. Indeed, by 
linking airfield fees to historic cost and capping airfield fees 
at total cost but permitting any reasonable methodology and 
imposing no cap for non-airfield fees, the regulation certainly 
implies that non-airfield fees need not be cost-based. Nor is 
the fact that airlines typically have reached agreement with 
airports as to these fees of any special significance. Airlines 
have incentives to enter into agreements with airports, even if 
they are monopolists. And an individual airline may not have 
a large incentive to challenge the reasonableness of a monop-
oly rent, since its competitors at an airport would also be 
paying the same monopoly rent (by virtue of the prohibition 
against discriminating among aeronautical users), and any 
benefit of the litigation would be dispersed among the air-
lines.5

__________
 5 Individual airlines may still not have a strong incentive to 
challenge monopoly rates under the Final Policy, but the Secretary 
has (perhaps not unreasonably) interpreted s 113 to permit only 
airlines, and not trade associations such as ATA, to challenge the 
reasonableness of aeronautical fees.


 To be sure, the Final Policy allows airlines to challenge the 
reasonableness of an airport's methodology, so presumably an 
airline can challenge a non-airfield fee it believes is excessive. 
But the regulation provides that the Secretary will "not [ ] 
consider complaints about the reasonableness of fees set by 
agreement if filed by parties to the agreement," nor does he 
"expect to investigate routinely fees set by agreement." 6 
Airlines are presumably free not to enter into agreements 
with airports, thereby remaining able to challenge particular 
non-airfield fees, but we are told that there are certain 
business reasons that induce airlines to have fee agreements 
in place. At oral argument, counsel for the Secretary seemed 
to indicate that airlines would be permitted to enter into 
agreements under protest and then file complaints under 
s 113. But that explanation seems inconsistent with the 
regulation's language, which states that "[t]he threat of a 
complaint could discourage airport proprietors from putting 
forward their best offers in negotiations." It is thus not at all 
clear whether the Final Policy provides airlines with an 
adequate remedy to challenge non-airfield fees.

 Aside from these procedural ambiguities, the Final Policy 
provides no real guidance as to how the Secretary will 
determine reasonableness. As we have noted, s 113 may 
actually require the Secretary to set forth a full quasi-
legislative standard rather than developing those standards 
through a case-by-case approach. Even if the Secretary 
has more flexible authority under the statute, his regulation 
surely is inadequate under the APA. The Final Policy indi-
cates that the Secretary will consider "extraordinary situa-
tion[s]" (whatever that may mean) in the expedited pro-
ceedings under s 113; that the Secretary will consider the 
reasonableness of non-airfield fees "over the long term and 
not on the basis of a single year's results"; and that the 
Secretary will investigate only where there is "a case of 

__________
 6 Section 113 actually provides that it is inapplicable to fees set 
by agreement, 49 U.S.C. s 47129(e), but the Secretary "do[es] not 
interpret [s 113] to preclude an investigation of fees set by agree-
ment or the application of the policy in such an investigation," 61 
Fed. Reg. 31,994, 31,998 (1996), and no one challenges this interpre-
tation.


progressive accumulation of surplus aeronautical revenue." 
That the Secretary believes that only a long-term accumula-
tion of surplus aeronautical revenue is evidence of unrea-
sonable non-airfield fees implies that the only legal limit to 
airport charges is the ability to spend revenues fast enough 
on airport improvements, including those for non-
aeronautical concessions. That approach could lead to com-
petition to build the Taj Mahal of airports. See Indianapo-
lis Airport Auth., 733 F.2d at 1268.

 It may well be that, as the Secretary suggests, airports 
would face some restraint on the exercise of any market 
power that they might have. But we do not think the 
Secretary has adequately explained how those generally un-
specified restraints will ensure, in the absence of meaningful 
guidelines, that non-airfield fees are reasonable. Even as-
suming, however, that the Secretary on remand can with 
greater precision identify these restraints and justify notions 
of reasonableness of some or all aeronautical fees using 
concepts less restrictive than historic cost, there remains the 
most serious logical problem with his regulation--which we 
simply cannot accept. His explanation for the distinction 
drawn between airfield and non-airfield fees is internally 
inconsistent. Cf. Motor Vehicle Mfrs. Ass'n of United States 
v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48 (1983). 
The obvious difficulty, for instance, with the Secretary's 
reliance on his perception that public airports are not profit 
maximizers is that the proposition, if correct, would apply 
equally to airfield charges, so it hardly can be relied upon to 
support a different approach to non-airfield fees. Even the 
specific alleged restraint on the airports' use of market power 
to charge excessive non-airfield fees--that airports compete 
to be hub locations--would, if significant, also restrain airfield 
charges. Surely airlines, when determining where to locate 
hub facilities, are not indifferent to airfield charges, since 
they channel their flights in and out of those hub facilities. 
We are obliged therefore to vacate the rule and remand to 
the Secretary.


 IV.

 Los Angeles makes in part the same point: that the 
Secretary's disparate treatment of airfield and non-airfield 
charges is arbitrary and capricious, albeit from the perspec-
tive of applauding the Secretary's approach to non-airfield 
charges. The record does not reveal why Los Angeles is the 
sole airport owner to challenge the regulation. We know only 
that it is one of the few (if not the only) municipalities that 
stopped taking federal grant money--which, as noted, carries 
with it an obligation to continue using airport facilities as an 
airport--in the early 1990s.

 In any event, Los Angeles' primary attack is directed at the 
Secretary's requirement of valuing assets at historic cost in 
calculating airfield charges. The Secretary was careful not to 
make the same mistake that caused us to reject his prior 
determination that Los Angeles was obliged to use historic 
cost as the basis for airfield fees. See LAX I, 103 F.2d at 
1032. Los Angeles then, as now, argued that it should be 
entitled to use the fair market value of the land--which in 
downtown Los Angeles is quite dear--as the basis for those 
charges because it accurately reflects the opportunity cost of 
devoting LAX to airport use. In the prior proceeding, the 
Secretary had simply assumed, erroneously we held, that the 
Anti-Head Tax Act and s 113 require historic cost valuation. 
This time he did not. He did observe that since airports are 
obliged to use their property as an airport, the concept of 
opportunity cost, and therefore fair market value, does not 
quite fit. (That logic, however, may not apply to Los Ange-
les.)

 The Secretary explained why he thought historic cost was 
generally preferable to other valuation bases such as fair 
market value: it is simply easier to administer and less likely 
to generate controversies. We observed in LAX I, however, 
that valuing land (the principal airfield asset) does not pres-
ent the same difficulties as valuing, for example, utility plants 
and equipment, for "there is no need to reconstruct a hypo-
thetical asset in order to account for technological changes, 
and there is often (indeed, perhaps usually) a ready market in 
parcels sufficiently comparable for a professional appraiser to 


extrapolate with some confidence." 103 F.3d at 1033; cf. 
Duquesne Light Co. v. Barasch, 488 U.S. 299, 308-09 (1989). 
Nor has the Secretary actually given any reason to think 
controversies will be less likely to occur using historic cost. 
In LAX I, the airlines did not contest the accuracy of the 
appraisal obtained by Los Angeles for the land at LAX, 103 
F.3d at 1033; in a later proceeding the airlines' appraisal of 
the land at LAX was actually higher than the airport's; nor is 
there a guarantee that historic cost will cause few or no 
disputes. And, so far as we can tell, airports need only 
appraise the market value of the land once in order to bring it 
into the rate base. See id. Although permitting a methodol-
ogy other than historic cost valuation might, in the Secre-
tary's words, "turn landing fee disputes into debates between 
real estate appraisal experts with [the Secretary] in the role 
of referee," it is not apparent why this justifies requiring 
historic cost: the Secretary can adopt any number of fairly 
simple procedures, such as the "final offer" device used in 
baseball arbitration, see Southern Pac. Trans. Co. v. ICC, 69 
F.3d 583, 585 (D.C. Cir. 1995), for administering such dis-
putes.7

 Even if ease of determination were an appropriate ground 
for requiring historic cost valuation of assets in determining 
airfield fees, however, the Secretary's use of it here under-
mines his treatment of non-airfield fees. By permitting non-
airfield fees to be set according to any reasonable methodolo-
gy, the Final Policy leaves airports free to choose any valua-
tion method, including fair market value; the regulation thus 
permits airports, in the context of non-airfield fees, to use 
methodologies that the Secretary has determined are too 
difficult to use in the context of airfield fees. As Los Angeles 
puts it, the Secretary simply has not explained why fair 
market valuation may be appropriate for other portions of the 
airport, but too difficult to use in valuing airfield assets.

__________
 7 By apparently choosing to submit fees to something approach-
ing de novo review, the Secretary seems to have burdened himself 
with administrative difficulties.


 V.

 There remains the Secretary's treatment of "imputed inter-
est" which, if anything, is even more puzzling to us than the 
rest of his rule. The Secretary's Final Policy permits an 
airport to include in its airfield fees a charge for imputed 
interest on funds the airport reinvests in its airfield (unless, 
of course, debt service costs are already included as explicit 
interest). But airports are only permitted to include such 
imputed interest in airfield fees insofar as the reinvested 
funds stem from non-airfield fees, not from airfield fees. The 
Secretary's rule permits the former, but not the latter, be-
cause he reasoned that to charge this cost of capital to the 
airlines for funds derived from airfield fees would be double 
charging: the airlines would get stuck with both the excess 
revenue and the imputed interest on that excess.

 ATA objects to paying any imputed interest as part of 
airfield fees no matter the source of the funds, claiming in 
effect that, if it is double charging to charge imputed interest 
on the funds derived from airfield fees, it is equally double 
charging to include imputed interest on funds stemming from 
non-airfield fees. We agree, in a sense, because we do not 
understand what the Secretary means by double charging. 
Airports receive revenues from essentially three sources: 
airfield fees, non-airfield fees, and concession leases. Al-
though airports cannot invest outside the airport, they can 
reinvest, and indeed may be obliged to reinvest, in all three 
airport activities--certainly at least the first two. And they 
have discretion as to the object of their investment, which 
makes the revenue airports receive from the three sources 
fungible. Therefore, as the Secretary suggested, there is an 
opportunity cost in reinvesting in one activity rather than the 
other two: the forgone revenue that would be received had 
the airport invested those funds in the other two. There may 
be a case to be made, similar to the Secretary's argument 
regarding most airports' lack of opportunity costs generally, 
that because airports do not have wide discretion as to where 
they put surplus funds (they cannot invest off airport), their 
cost of capital (opportunity cost) is less than would be true of 
another business, but we frankly do not understand the 


distinction the Secretary makes between funds that stem 
from airfield fees and those that come from non-airfield fees.

 * * * *

 The Secretary seems to have come up with a rule that 
represents an overall rough compromise between the inter-
ests of most airports and carriers. Unfortunately it is much 
too rough to withstand judicial review under the APA. Ac-
cordingly, we vacate the challenged provisions of the Final 
Policy, paragraphs 2.4, 2.4.1, 2.4.1(a), 2.5.1, 2.5.1(a), 2.5.1(b), 
2.5.1(c), 2.5.1(d), 2.5.1(e), 2.5.3, 2.5.3(a), 2.6, the Secretary's 
supporting discussion in the preamble, and any other portions 
of the rule necessarily implicated by the holding of our 
opinion, and remand this proceeding to the Secretary. Our 
action in this case does not reinstate any part of the Secre-
tary's Interim Policy that the Final Policy was intended to 
replace.