165 F.3d 972
 334 U.S.App.D.C. 185
 CITY OF LOS ANGELES, et al., Petitioners,
v.
UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Respondents.
Airports Council International--North America, et al., Intervenors.
 No. 98-1071.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 7, 1999.
Decided Feb. 5, 1999.
 
 On Petition for Review of Orders of the United States Department of Transportation.
 Steven S. Rosenthal argued the cause for petitioners. With him on the briefs were Jeffery A. Tomasevich, Scott P. Lewis, Kenneth W. Salinger, Ronald N. Wilson, Stanley A. Zamel, and Breton K. Lobner. Leilani F. Battiste entered an appearance.
 Thomas L. Ray, Senior Trial Attorney, United States Department of Transportation, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Marion L. Jetton, Attorneys, Nancy E. McFadden, General Counsel, United States Department of Transportation, and Paul M. Geier, Assistant General Counsel.
 Jonathan S. Franklin argued the cause for intervenors Air Transport Association of America, et al. With him on the brief was Allen R. Snyder.
 G. Brian Busey, Anthony L. Press, and Patricia A. Hahn were on the briefs for intervenor Airports Council International--North America.
 Before: SILBERMAN, SENTELLE and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 The City of Los Angeles increased the landing fees at Los Angeles International Airport, and the airlines challenged those fees as unreasonable before the Department of Transportation. The DOT set aside the increased fees, reasoning that the City's attempt to recoup its "opportunity costs" through the fees was impermissible as a matter of statute. In City of Los Angeles v. DOT, 103 F.3d 1027 (D.C.Cir.1997), we rejected that statutory interpretation and remanded for the DOT to consider the opportunity cost issue as a matter of policy. The DOT did so, concluding that the City's claimed entitlement to recover its opportunity costs was unreasonable, and rejected the fees. The City petitions for review. We deny the petition.
 
 I.
 
 2
 Until 1993, the City of Los Angeles, pursuant to a contractual agreement with the airlines, established landing fees at the Los Angeles International Airport (LAX) based on a residual methodology. Under that technique, the City estimated the revenue and cost attributable to non-aeronautical operations--such as parking contracts and concession franchising--for the coming fiscal year. Expected nonaeronautical surplus, if any, was then applied toward the anticipated cost of aeronautical operations. Landing fees were set (based on estimated landed weight) at a sufficient level to make up for the remaining aeronautical cost. In 1992, the last year in which the City used this methodology, the fee was $.51 per 1,000 pounds of landed weight. In 1993, the expiration of the City's contract with the airlines opened the door for the City to adopt the potentially more lucrative compensatory fee methodology. That approach treats aeronautical operations separately from non-aeronautical operations; the airport sets landing fees at a sufficient level to compensate it for the entirety of its aeronautical costs, and any surplus or deficit from non-aeronautical operations is irrelevant.
 
 
 3
 The City also decided in 1993, for the first time, to include in its estimated aeronautical costs a charge reflecting the current annual fair market rental value of the land on which the airfield rests. The City thought itself entitled to recover this "opportunity cost," for only then would the City be compensated fully for the cost of using the land as an airport instead of pursuing its alternative opportunity to earn profits by renting the land.[1] The City appraised the current fair market value of the land at $150,000 per acre. (The City had purchased most of the 1,780.3 acres on which the airport is built over 50 years ago at an average price of $2,427 per acre.) Adjusting for the effects of federal grants and converting to an annual rental value, the City arrived at a figure of $8,348 per acre per year, or $14,861,900 per year for the entire 1,780.3 acres occupied by the airport. Putting this fair market rental value, among other costs, into its compensatory fee calculation, the City computed a landing fee of $1.56 per 1,000 pounds of landed weight (effective July 1, 1993), an increase of more than $1.00 over the 1992 fee. When contract negotiations looking to a compensatory fee agreement between the City and the airlines broke down, the City unilaterally imposed the $1.56 fee by ordinance, informing the airlines that they could not land at LAX unless they paid the increased fee.
 
 
 4
 The airlines challenged the fee increase pursuant to an expedited administrative procedure in which the Department of Transportation has authority to set aside unreasonable fees. See 49 U.S.C. § 47129 (1994); see also Anti-Head Tax Act, 49 U.S.C. § 40116(e)(2) (1994) (providing that a political subdivision of a State may levy or collect "reasonable ... landing fees"); 49 U.S.C. § 47107(a)(1) (1994) (requiring federal airport grant recipients to assure the DOT in writing that "the airport will be available for public use on reasonable conditions"). The Department determined the fee unreasonable, reasoning that the Anti-Head Tax Act's "requirement of reasonable fees ... mandat[es] the use of historic cost for airfield land"--i.e., the original acquisition cost of the land on which the airport was built--and thereby forbids consideration of opportunity cost. Los Angeles Int'l Airport Rates Proceeding, Order No. 95-6-36, at 24 (June 30, 1995). In the meantime, the City had announced a new landing fee in 1995 of $2.06 per 1,000 pounds of landed weight (effective July 1, 1995), again including among its costs its claimed "opportunity cost," i.e., the forgone fair rental value of the airfield land. The airlines challenged this fee before the DOT, and the Department set the fee aside for the same reason given in rejecting the 1993 fee. Second Los Angeles Int'l Airport Rates Proceeding, Order No. 95-12-33 (December 22, 1995).
 
 
 5
 In City of Los Angeles v. DOT (LAX I), 103 F.3d 1027 (D.C.Cir.1997), we granted the City's petition for review of the Department's decision regarding the 1993 fee. (We had stayed proceedings relating to the 1995 fee pending our review of the Department's decision on the 1993 fee.) We concluded that the Department had no basis for its view that the Anti-Head Tax Act forbade the consideration of opportunity costs in determining the reasonableness of landing fees and permitted only the consideration of historic costs. Id. at 1032. Although we noted that "[h]istoric cost is ... one permissible measure of costs in cost-of-service rate-making," we rejected the "Secretary's view of historic cost as the apodictically indicated measure of 'actual cost.' " Id. Accordingly, we vacated the Secretary's decision and remanded "for his fuller consideration of the respective merits of the historic cost and [opportunity cost] methodologies here at issue." Id. We granted the Department's request for a remand of the 1995 fee proceeding to conduct a similar policy evaluation of the competing methodologies. See Air Transport Ass'n of Am. v. DOT, No. 96-1018 (D.C.Cir. March 7, 1997) (per curiam order).
 
 
 6
 On remand, the DOT consolidated the 1993 and 1995 fee proceedings. As before, the Department held that the 1993 and 1995 fees should be set aside because it was unreasonable for the City to recover its claimed "opportunity cost." Los Angeles Int'l Airport Rates Proceeding and Second Los Angeles Int'l Airport Rates Proceeding (Remand Decision), Order 97-12-31 (December 23, 1997). But this time the Department rested its decision explicitly on policy grounds. It pointed to the airport's obligation as a federal airport grant recipient to keep the airport "available for public use," 49 U.S.C. § 47107(a)(1), and to another provision that bars a grant recipient from making any alteration to the airport's layout unless the Secretary decides that the change will not "adversely affect the safety, utility, or efficiency of the airport," id. § 47107(a)(16)(C). See Remand Decision at 13. These provisions forbid the City from converting the airfield land to rental property; the City at present has no lawful opportunity to use the land in any capacity other than as an airport. (Although the Department and the City seem to disagree on precisely when the City's grant assurance obligation will expire, it is undisputed that the grant assurance obligation is currently in force.) The Department therefore concluded that it would be unreasonable for the City to recover compensation through its landing fees for a "lost opportunity" that does not lawfully exist. See id. at 14.
 
 
 7
 Alternatively, the DOT held that even if the City were thought to incur opportunity costs, the fees should be set aside because the City's "benefits" from operating LAX already sufficed to cover the City's opportunity costs. The Department viewed the City, rather than the airport, as the relevant economic actor; pursuing the rental opportunity would require the City either to build a new airport (or expand an existing minor airport such as Long Beach or Orange County), or else simply to go without a major airport. The latter option, according to the Department, would entail an enormous loss to the City; a 1992 study quantified the benefits of LAX "in terms of jobs (402,000); direct, indirect, and induced economic impacts ($37 billion per year); and state and local taxes ($1.7 billion per year)." Id. at 17. And the City would sacrifice the current revenue the City earns from its airfield and non-airfield activities at LAX. In the Department's view, these losses far outweigh any reasonable forecast of rental revenue--the City's estimate of that revenue, recall, was a mere $14,861,900 per year. In short, the stream of benefits from using the land as rental property rather than as an airport would be smaller than the stream of benefits from operating the airport--i.e., the opportunity cost of using the land as an airport was already being covered. And the Department thought the calculus would not be much different if the City, rather than going without a major airport, attempted to build a new major airport or expand existing minor airports. Relying on the City's own appraisal firm's report that the "relocation of the Los Angeles International Airport (LAX) is practically impossible" given the paucity of alternative airport development sites and the prohibitive costs of acquiring such a site, the Department concluded that once these costs were taken into account, the net profit from renting the LAX land would again be outweighed by the benefits of using the LAX land as an airport. Id. at 18-19. In the end, the Department concluded that the City's analysis of its opportunity costs--which treated only the airport as the relevant economic actor and considered only the annual rental income of $14,861,900--was overly simplistic, and therefore rejected the City's attempt to include its self-described "opportunity costs" in calculating its landing fees.
 
 
 8
 We should briefly mention a related proceeding, the DOT's effort to fulfill its statutory mandate under 49 U.S.C. § 47129(b)(2) to publish final regulations, policy statements, or guidelines establishing the "standards or guidelines that shall be used by the Secretary in determining ... whether an airport fee is reasonable." In June 1996, the Secretary published a regulation entitled the "Policy Regarding Airport Rates and Charges." See 61 Fed.Reg. 31,994 (June 21, 1996). The regulation required airports to value their airfield assets at historic cost, but allowed airports to use "any reasonable methodology" in valuing their non-airfield assets. Id. In Air Transport Association v. DOT, 119 F.3d 38 (D.C.Cir.1997), we vacated the regulation, challenged both by the airlines and Los Angeles, because, inter alia, the Secretary "simply ha[d] not explained why fair market valuation may be appropriate for other portions of the airport, but too difficult to use in valuing airfield assets." Id. at 44. The Secretary is presently in the process of formulating a new regulation on airport fees, and has issued an advance notice of proposed rulemaking asking for comments on what cost methodologies should be required for airfield and non-airfield fees. See 63 Fed.Reg. 43,228 (Aug. 12, 1998). The City contends that our vacatur of the Department's regulation in Air Transport Association somehow casts doubt on the Remand Decision presently before us. But the Department did not rely on its vacated regulation, see Remand Decision at 8, and has not yet adopted a new regulation on the appropriate methodology for non-airfield fees as compared to airfield fees.
 
 II.
 
 9
 The City and the Department before us principally dispute the reasonableness of the City's methodology of fee calculation, not the reasonableness of the magnitude of the resulting fees.
 
 A.
 
 10
 Reiterating its first reason for rejecting the City's fee methodology, the Department submits that it is unreasonable to attempt to include as an airfield cost the "opportunity cost" of employing the land as an airport rather than as rental property, for the proposed opportunity does not lawfully exist at present. As one of the members of the panel observed, in paraphrasing the DOT's argument, the City is like an owner of a hot dog stand who claims his opportunity cost is the revenue he would earn by selling cocaine rather than hot dogs. The City contends, however, that the Department has adopted an erroneous conception of opportunity cost; for an economist, we are told, the present impossibility of pursuing the opportunity to rent the airfield land does not mean that no opportunity cost has been incurred.
 
 
 11
 At bottom, the parties' dispute as to the concept of opportunity cost seems to rest on a single question: Should the legal barrier to pursuing the opportunity be treated as immutable? If opportunity costs are measured as of now and the grant assurance obligation is viewed as fixed, then the Department's view would seem inevitable. For then the City would have no opportunity to use the land in any non-airport capacity--the City at least would face enormous transition costs (the cost of violating the law or perhaps of buying a release from the obligation) in pursuing the opportunity, which alone could render the potential profit from that opportunity small or even negative. But if we ignore (i.e., treat as changeable at zero cost) the present legal hurdle to pursuing the opportunity, then the City's position is much stronger.
 
 
 12
 To be sure, an economist formulating an efficient plan for regulating the City's monopoly over landing space might well take the City's view, treating all regulatory tools--including existing grant assurance obligations--as easily changeable. Cf. WILLIAM J. BAUMOL & J. GREGORY SIDAK, TRANSMISSION PRICING AND STRANDED COSTS IN THE ELECTRIC POWER INDUSTRY 53 (1995). But the airlines' expert suggested otherwise when he testified that "[s]ometimes the opportunity is virtually nil, in which case there is no opportunity cost." In any event, that some or many economists would disapprove of the Department's approach does not answer the question presented to us. In reviewing the Department's order, we do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority. See Air Canada v. DOT, 148 F.3d 1142, 1151 (D.C.Cir.1998); LAX I, 103 F.3d at 1031 (citing Northwest Airlines v. County of Kent, 510 U.S. 355, 366-68, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994)); see generally Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The City submits that our review should be more strict given that the Department arrived at the same result on remand as it had reached in its initial decision, but that proposition strikes us as flatly inconsistent with the Chenery doctrine. See SEC v. Chenery Corp. (Chenery I), 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943); SEC v. Chenery Corp. (Chenery II), 332 U.S. 194, 200, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) ("We held no more and no less [in Chenery I] than that the Commission's first order was unsupportable for the reasons supplied by that agency."). To be sure, there is some support for the City's view in our cases. See, e.g., Greyhound Corp. v. ICC, 668 F.2d 1354, 1358 (D.C.Cir.1981). But as we have more recently explained, "[w]hile we are mindful that [the agency] has adhered to the position it first took in the decision that we remanded, cf. [Greyhound], our review is still a matter of determining whether the agency's final decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " Competitive Enter. Inst. v. NHTSA, 45 F.3d 481, 484 (D.C.Cir.1995) (quoting State Farm, 463 U.S. at 43, 103 S.Ct. 2856).
 
 
 13
 Here we cannot say it was irrational for the Department to treat the grant assurances as a given and evaluate the City's proposed methodology from that perspective. And the grant assurance obligations may in fact be a fixed point for the DOT. Although the Department has some control over grant assurances insofar as the grant recipient ab initio promises the Department to keep the airport open for public use, see 49 U.S.C. § 47107(a)(1), it is unclear whether the Department is free at this stage to release an airport from its promise--to do so might violate the statute.[2]
 
 
 14
 The City argues that the Department's "no opportunity, hence no opportunity cost" rationale attempts an "end run" around our holding in LAX I that the Anti-Head Tax Act, 49 U.S.C. § 40116(e)(2), does not itself proscribe consideration of opportunity costs in establishing reasonable landing fees. See LAX I, 103 F.3d at 1032. The City explains that under the Remand Decision, no airport that accepts federal grants (and thus gives grant assurances) could ever justify the recovery of opportunity costs--the result is a "per se rule" against using opportunity costs in calculating landing fees, which is another way for the Department to claim that it is legally mandated to reject the opportunity cost methodology. But the Department did not say that it was obliged to take into account the federal grants. Even if it were, in LAX I, we addressed only the Anti-Head Tax Act and the expedited review provision, see LAX I, 103 F.3d at 1032 ("Nothing in the Anti-Head Tax Act or [the expedited review provision] ... prescribes an accounting rather than an economic conception of cost in airport ratemaking."), and did not analyze any argument based upon the federal airport grant provision.
 
 
 15
 Intervenor Airports Council International (ACI) points to a different alleged problem with the Department's "no opportunity, hence no opportunity costs" rationale: ACI submits that DOT has retroactively added new conditions to the City's grant assurances by relying on those grant assurances to deprive the City of the ability to recover its opportunity costs, which ACI claims conflicts with the "clear statement" requirement of Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). But we do not view the Department's reasoning as adding new conditions to the grant. Rather, the Department focused on a consequence of an unambiguously imposed condition--that the airport would be kept open for public use--that was present from the outset.
 
 B.
 
 16
 Even were we to hold the Department's first rationale unlawful, we would uphold its order. We cannot say--and the City does not seriously argue--that the DOT's alternative rationale, that if the City is deemed to incur opportunity costs, those costs are already covered by the existing "benefits" enjoyed by the City, is an unreasonable one. See Air Canada, 148 F.3d at 1142; LAX I, 103 F.3d at 1031; State Farm, 463 U.S. at 43, 103 S.Ct. 2856. The City does argue that the Department's "comprehensive opportunity cost analysis" rationale runs into a separate legal problem. By taking into account the current non-airfield revenue at LAX in deciding whether the City's opportunity costs are presently covered, it is claimed that the Department deprives the City of its right to use the compensatory fee methodology by forbidding the City from valuing its airfield assets without considering nonairfield revenues.[3] The compensatory fee methodology, the City reminds us, was recognized by the Supreme Court in Northwest Airlines, 510 U.S. at 369, 114 S.Ct. 855, and codified by Congress, see 49 U.S.C. § 47129(a)(2) ("A fee subject to a determination of reasonableness under this section may be calculated pursuant to either a compensatory or residual fee methodology or any combination thereof."). This is a clever argument, but not persuasive because the Department in no sense adopted a general requirement that airports must credit their non-airfield surpluses toward their airfield costs. The DOT is only taking into account non-airfield revenues, as well as all other economic benefits the City enjoys, in determining whether Los Angeles really has an uncovered opportunity cost. It is the City itself, by using the opportunity costs concept, that has invited the Department to think broadly about how such costs should be measured. And we cannot hold that it was unreasonable for the DOT, when faced with a demand for an economic analysis, to consider factors that an economist might take into account.[4]
 
 III.
 
 17
 The City argues that the setting aside of its fees amounted to an unconstitutional taking. The question is entirely one of the adequacy of the fee the Department permits the City to charge; the Takings Clause has nothing to do with the methodology of ratemaking. See Duquesne Light Co. v. Barasch, 488 U.S. 299, 314, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989); FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944) ("It is not the theory but the impact of the rate order which counts."); Jersey Central Power & Light Co. v. FERC, 810 F.2d 1168, 1176 (D.C.Cir.1987) (en banc). Determining whether a taking has occurred in the ratemaking context requires us to examine whether the authorized rate reveals that the agency has reasonably balanced the investor and consumer interests at stake. Jersey Central, 810 F.2d at 1177-78. The "legitimate investor interest" is a question of
 
 
 18
 the financial integrity of the company whose rates are being regulated. From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. These include service on the debt and dividends on the stock. [The return] should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.
 
 
 19
 Id. at 1176 (quoting Hope, 320 U.S. at 603, 64 S.Ct. 281).
 
 
 20
 The Department contends, and we agree, that these principles do not precisely carry over to the situation presented here of a municipally-owned airport as the regulated entity. A municipality has no stockholders, so it makes little sense to analyze the proper return on equity. That is not to say that the Takings Clause has no application here. The Supreme Court has explained that the Clause applies to the federal government's condemnation of property owned by a local government, see United States v. 50 Acres of Land, 469 U.S. 24, 31, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984), and we see no logical reason why a different rule should apply in the ratemaking context. Although the City (LAX) does not have equity investors, it does have bondholders, and it makes perfect sense to ask whether the entity's rates are sufficient "to maintain its credit" and to "assure confidence in the financial integrity of the enterprise." Hope, 320 U.S. at 603, 64 S.Ct. 281; cf. 49 U.S.C. § 47101(a)(13) (providing that it is the policy of the United States "that airports should be as self-sustaining as possible").
 
 
 21
 The only suggested "hardship" under the current fees is a lack of flexibility in undertaking airport improvement projects. (The thrust of the City's argument is the oblique claim that the City is being denied a "fair" rate of return.) The City has never alleged that its current fees jeopardize the financial integrity of LAX, and therefore the City had no right to a hearing before the Department on its Takings Clause claim. Compare Jersey Central, 810 F.2d at 1181-82 (regulated entity was entitled to a hearing where it "presented allegations, which, if true, suggest that the rate order almost certainly does not meet the requirements of Hope Natural Gas, for the company has been shut off from long-term capital, is wholly dependent for short-term capital on a revolving credit arrangement that can be cancelled at any time, and has been unable to pay dividends for four years").
 
 
 22
 * * *
 
 
 23
 For the foregoing reasons, the petition for review is
 
 
 24
 Denied.
 
 
 
 [1]
 A leading economics text defines "opportunity cost" in this way: "[M]aking a choice in effect costs us the opportunity to do something else. The alternative forgone is called the opportunity cost...." PAUL A. SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 128 (16th ed.1998)
 
 
 [2]
 In a contention related to its attack on the Remand Decision as economically unsound, the City argues that the airlines, as proponents of an order setting aside the fees, failed to carry the burden of persuasion assigned to them by the Administrative Procedure Act. See 5 U.S.C. § 556(d) (1994); Air Canada, 148 F.3d at 1155-56 (citing Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 272, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994)). We think this argument lacks merit, given that the airlines did introduce in evidence the City's grant assurances, and that the Department's conclusions turned on its own policy determination. See Air Canada, 148 F.3d at 1157
 
 
 [3]
 The compensatory fee methodology, recall, permits an airport to set landing fees at a sufficient level to cover its airfield costs and, unlike the residual methodology, does not require an airport to apply any surplus from non-airfield activities toward those airfield costs
 
 
 [4]
 Intervenor ACI objects that the Department's "comprehensive opportunity costs analysis," carried to its logical conclusion, could prevent airports from charging landing fees at all, depending on the level of benefit provided to the residents and businesses of the city-owner. But the Department has not in fact pursued that approach--to do so would raise a serious Takings Clause question