213 F.3d 724 (D.C. Cir. 2000)
 General Instrument Corporation, Petitioner
v.
Federal Communications Commission and United States of America,Respondents
National Cable Television Association, Inc., et al., Intervenors
 Nos. 98-1420, 98-1423, 98-1576, 99-1204, 99-1312, 99-1313
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued April 6, 2000
Decided June 6, 2000
 
 [Copyrighted Material Omitted]
 On Petitions for Review of Orders of the Federal Communications Commission
 Theodore White house argued the cause for petitioners and supporting intervenor. With him on the briefs were John L. McGrew, Glenn B. Manishin, Christy C. Kunin, Daniel L. Brenner, Neal M. Goldberg, Loretta P. Polk, Bruce D. Ryan, and Michelle W. Cohen.
 Roberta L. Cook, Counsel, Federal Communications Commission, argued the cause for respondents. Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, Lisa A.Burns, Counsel, Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys, were on the brief. James M. Carr and Nancy L. Kiefer, Counsel, Federal Communications Commission, entered appearances.
 David Alan Nall argued the cause for intervenors. With him on the brief were Jonathan Jacob Nadler, Jonathan D. Blake, Joe D. Edge, Mark F. Dever, Catherine M. Krupka, and Kevin S. DiLallo. Benigno E. Bartolome, Jr. and John W. Pettit entered appearances.
 Before: Silberman, Williams, and Sentelle, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Silberman.
 Silberman, Circuit Judge:
 
 
 1
 Petitioners challenge an order of the Federal Communications Commission precluding cable television operators from offering "integrated" converter boxes that perform both security and ancillary functions. We think the Commission's ban on integrated devices is premised on a reasonable interpretation of section 629 of the Communications Act, and we deny the petitions.
 
 I.
 
 2
 This case concerns a piece of electronic equipment familiar to most American consumers: the set-top cable or "converter" box. Converter boxes are the most common instrument ("navigation device") that provides access to cable programming or other multichannel video programming services[1]. The typical converter box performs an important security or "conditional access" function, containing embedded technology that decodes or descrambles a digital or analog cable signal.[2] It is this function that precludes a consumer from accessing tiers of cable programming not part of his subscription package. At the same time, converter boxes often perform other tasks--which we refer to for simplicity's sake as ancillary functions--unrelated to security. For instance, converter boxes commonly include channel tuners and provide access to video programming guides.
 
 
 3
 Converter boxes traditionally have been available to consumers only by lease from cable operators, as part of a cable service package. Section 629 of the Communications Act, passed by Congress as part of the Telecommunications Act of 1996, sought to change this state of affairs. The FCC was directed to take steps to make converter boxes (and other navigation devices) commercially available from sources other than cable operators. Entitled "Competitive Availability of Navigation Devices," section 629 provides as follows:
 
 
 4
 (a) Commercial consumer availability of equipment used to access multi-channel video programming distributors. The Commission shall, in consultation with appropriate industry standard-setting organizations, adopt regulations to assure the commercial availability, to consumers of multi-channel video programming... of converter boxes, interactive communications equipment, and other equipment used by consumers to access multi-channel video programming ... from manufacturers, retailers, and other vendors not affiliated with any multi-channel video programming distributor. Such regulations shall not prohibit any multi-channel video programming distributor from also offering converter boxes, interactive communications equipment, and other equipment used by consumers to access multi-channel video programming... if the system operator's charges to consumers for such devices and equipment are separately stated and not subsidized by charges for any such services.
 
 
 5
 (b) Protection of system security. The Commission shall not prescribe regulations under subsection (a) of this section which would jeopardize security of multi-channel video programming ..., or impede the legal rights of a provider of such services to prevent theft of service.
 
 
 6
 47 U.S.C. § 549(a)-(b).
 
 
 7
 The Commission issued a Notice of Proposed Rulemaking seeking comment on how best to implement section 629's requirements.[3] It explicitly recognized that it was required to balance section 629(a)'s mandate for "commercial availability" with section 629(b)'s prohibition against any Commission action that would "jeopardize" the security of cable programming. Any solution requiring devices containing conditional access functionality to be made widely available at retail certainly would exacerbate the problem of cable theft, already a $5 billion dollar drain on cable operators and their customers. But the Commission offered a possible alternative that it thought might "assure commercial availability" of navigation devices without posing a major risk to cable security. It noted that
 
 
 8
 [i]n theory, it would be possible to take a typical decoder box and divide it into two separate parts. One part would contain the operational and functional components such as the tuner, the remote control circuitry, the power supply, and any other non-access control features. A second part would contain the access control features. With an interface, it would be possible to have the first part of the device available through retail outlets, and the second part, containing the more sensitive access control apparatus, available only from the service supplier.
 
 
 9
 In other words, the Commission suggested a separation of the traditional converter box into two parts (unbundling), permitting a device providing ancillary functions to be available at retail while allowing cable operators to maintain exclusive control over conditional access functionality.
 
 
 10
 After receiving comments, the FCC issued an order adopting this proposal. See In re Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, 13 F.C.C.R. 14775 (1998) ("Navigation Devices Order"). Cable operators were directed to make available separate security components or "modules" by July 1, 2000. See 47 C.F.R. S 76.1204(a)(1) & (e). The Commission's notion was that these modules could then be "plugged in" to commercially available equipment performing ancillary functions. It recognized that standardized digital and analog interfaces would be necessary to make the security modules uniformly compatible with retail equipment performing ancillary functions. After a lengthy discussion of technological alternatives, the Commission, noting the "dangers of detailed government standard setting," left it to the cable industry and its national standard-setting organizations to develop the appropriate interfaces.
 
 
 11
 The FCC did more than impose this separation requirement on cable operators. The question remained concerning precisely what equipment cable operators would be allowed to provide. In addition to mandating the "commercial availability" of converter boxes, section 629(a) states that the Commission "shall not prohibit" cable operators from providing those devices. Cable industry commenters asserted that operators should be able to offer the traditional "integrated" converter boxes that perform both conditional access and ancillary functions, so long as they make available a separate security module for use in combination with retail navigation devices. The Commission disagreed:
 
 
 12
 We conclude that the continued ability [of cable providers] to provide integrated equipment is likely to interfere with the statutory mandate of commercial ability and that the offering of integrated boxes should be phased out. We agree with those commenters who note that integration is an obstacle to the functioning of a fully competitive market for navigation devices by impeding consumers from switching to devices that become avail-able through retail outlets.
 
 
 13
 It accordingly required cable operators to cease providing new integrated cable boxes by January 1, 2005. See 47 C.F.R. S 76.1204(a)(1). Cable operators could, however--like any retailer--provide a device performing only ancillary functions, which could in turn be combined with the security module by the consumer.
 
 
 14
 Commissioner Powell wrote a separate statement dissenting in part. While he agreed with the Commission's requirement that cable operators make available separate security modules with standard interfaces, he argued that the agency's decision barring them from producing integrated devices was unsound. He thought that efficiencies might well accompany the integration of security and ancillary functions in a single device, and that the Commission's ban might "den[y] a cost effective choice for consumers." "It is quite plausible to me," he explained, "that the 'impediment' to switching to retail may in fact be a consumer preference for distributor-supplied integrated boxes! I see no reason to attempt to control consumer preferences."
 
 
 15
 In response to requests for reconsideration from several commenters, the Commission modified some of the conclusions it reached in the Navigation Devices Order.[4] It deferred indefinitely the July 2000 separation deadline for navigation devices providing access to analog video programming. Finding a consensus among commenters that the cable industry was rapidly moving from analog to digital programming, the FCC concluded that "the application of Section 629 to analog devices would result in unnecessary expenditures by [the cable industry] for a module that will soon be obsolete." However, it reaffirmed the separation deadline for digital devices and, importantly for the purposes of this case, it also applied the separation requirement to so-called "hybrid" converter boxes capable of processing both analog and digital signals. The agency, over the protestations of commenters in the cable industry, maintained its prohibition against integrated navigation devices. Commissioner Powell again voiced his objection to the integration ban in a brief dissenting statement.
 
 
 16
 Several members of the cable industry now petition for review of the Navigation Devices Order and the Reconsideration Order. Petitioners' primary argument is that the FCC exceeded its authority under section 629 by precluding cable operators from offering integrated converter boxes to their customers. They do not challenge the Commission's separation requirement insofar as it applies to digital equipment. They do, however, object to the Commission's requirement that cable operatorsmake available separate hybrid security modules.
 
 II.
 
 17
 Petitioners assert that the integration ban is squarely foreclosed by the second sentence of section 629(a), which states that the Commission's regulations "shall not prohibit any multi-channel video programming distributor from also offering converter boxes, interactive communications equipment, and other equipment used by consumers to access multi-channel video programming." (emphasis added). While the term "converter box" is not defined in the 1996 Act, petitioners claim that the term at the very least includes those integrated devices that the Commission banned in the Navigation Devices Order. They point out that the most common type of navigation device in existence at the time of the passage of the 1996 Act was the integrated converter box.The Commission stumbles over the first step of Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), in petitioners' view, because the second sentence of section 629(a) clearly prohibits the Commission from enacting the integrated device ban.
 
 
 18
 The attractive simplicity of petitioners' construction, as the Commission persuasively responds, dissolves upon close scrutiny. For the term "converter box" also appears in the first sentence of section 629(a): "The Commission shall enact regulations to assure the commercial availability of converter boxes...." (emphasis added). If petitioners' interpretation is correct, the Commission is therefore equally compelled by the plain language of the statute to permit retailers to provide integrated navigation devices, see, e.g., Sullivan v. Stroop, 496 U.S. 478, 484 (1990) (noting presumption that "identical words used in different parts of the same act are intended to have the same meaning")--certainly an unacceptable result from petitioners' point of view.
 
 
 19
 Petitioners gamely insist that the parallel language in the first and second sentences of 629(a) is not fatal to their argument. They do not dispute that Congress meant to use the term "converter box" consistently in the statute. They acknowledge that, if section 629(a) were to be applied in isolation, the Commission would be obliged to permit both cable providers and retailers to provide integrated navigation devices. Their construction is saved from that concededly unacceptable outcome according to them, because another section, section 629(b), limits section 629(a), precluding the Commission from implementing the statute's commercial availability requirement in a manner that "jeopardizes" the security of cable programming. Since permitting retailers to offer integrated devices would undoubtedly "jeopardize" security, petitioners reason, the Commission must prohibit them from doing so--but this limitation does not alter the clear command in the second section of section 629(a).
 
 
 20
 Petitioners offer a plausible construction, but it is somewhat strained. They reach their result only by reading section 629(b) not merely to "limit" section 629(a), but to disrupt the textual symmetry of its language. We have before us two constructions then, both of which interpret section 629(b)'s mandate as "limiting" section 629(a) in a not obvious manner. The FCC's interpretation maintains consistency between the provision's two sentences by adopting a narrow definition of "converter box." Petitioners take the opposite approach, holding to the more typical definition of "converter box" in one sentence of section 629(a) at the price of the same term meaning something entirely different in the other. Under Chevron, we are obliged to accept the Commission's interpretation which is easily a permissible one.
 
 
 21
 We move on to petitioners' alternative (but related) statutory theory: that section 629(b)'s prohibition of regulations"which would jeopardize security of multi-channel video programming" precludes the Commission's integration ban (emphasis added). It is argued that evidence in the record indicates that "embedded security currently contained in integrated equipment is a more secure method of protecting intellectual property than is separated security." Petitioners contend that this evidence, combined with a rather liberal definition of the word "jeopardize" as meaning any increase in security risk, should lead us ineluctably to the conclusion that the Commission's prohibition of integrated devices is unlawful.
 
 
 22
 We think petitioners' premise that any Commission action that (even slightly) increases security risk "jeopardizes" cable programming is wrong. To place something in "jeopardy" means to subject it to serious or significant danger. See Webster's Third New International Dictionary (1981) (defining "jeopardize" as "to expose to danger (as of imminent loss, defeat, or serious harm): Imperil"). In any event, we do not see how the Commission's decision to ban integrated converter boxes in and of itself poses any threat to system security. Petitioners point to evidence purportedly showing that the separation of security functions increases the risk of cable theft. But petitioners do not challenge the Commission's separation requirement--at least with respect to digital navigation devices.[5] Regardless of our disposition of the Commission's integration ban, would-be cable thieves will be able to request separate security modules from their cable operators. Petitioners' failure to explain how the Commission's bar on integration would in and of itself threaten the security of digital cable systems is fatal to their section 629(b) statutory argument. In sum, we think petitioners' statutory objections to the Commission's ban on integrated digital and hybrid navigation devices, while well-presented by counsel, are insufficient to clear the formidable hurdle of Chevron deference.[6]
 
 
 23
 Petitioners at oral argument sought to slide from their statutory claim to an argument that the Commission's economic policy decision to ban the sale of integrated devices was unsound--essentially to echo Commissioner Powell's thoughtful position. The Commission concluded that integration would "impede[ ] consumers from switching to devices that become available through retail outlets," Navigation Devices Order, 13 F.C.C.R. at 14803. This statement does not in and of itself tell us very much, without further explanation as to why consumers would be "impeded." Consumers might have chosen not to purchase retail devices for perfectly sensible economic reasons--because, for instance, there are efficiency gains captured in the manufacture of an integrated box that lead it to cost less than the combined cost of a separate security module and a retail device, or because consumers view as too high the transaction costs of seeking a separate ancillary device at retail. If this is the case, the integration ban does nothing more than deny the mostcost-effective product choice to consumers--an ironic outcome for an order implementing "one of the most pro-consumer, pro-competitive provisions of the Telecom Act." Id. at 14844 (separate statement of Commissioner Ness). Perhaps there are benefits that will flow to consumers from the integration ban,[7] but the Commission did not clearly spell them out. If it had, and if we nevertheless thought Commissioner Powell had the better argument, we would not on that basis alone be justified in reversing the Commission's economic judgment. See City of Los Angeles v. United States Dep't of Transp., 165 F.3d 972, 977 (D.C. Cir. 1999) ("In reviewing the Department's order, we do not sit as a panel of referees on a professional economics journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an agency acting pursuant to congressionally delegated authority.").
 
 
 24
 We need not decide this question, however, since petitioners did not assert in their briefs that the Commission's integration ban was arbitrary and capricious. At oral argument, counsel responded to this omission by noting that they did make a Chevron argument in their opening brief, and although it was phrased in Chevron step one terms, it necessarily implied a step two argument as well, and a step two Chevron argument is close enough to an arbitrary and capricious claim. Even granting petitioners' point that its statutory argument allows us to consider whether the statute, if ambiguous, was reasonably interpreted (Chevron step two), their problem is that that argument was put entirely in terms of statutory interpretation. At no point in their opening brief did petitioners contend that, even assuming the statute did not foreclose the Commission's policy, it was nevertheless unreasonable. To be sure, we have recognized that an arbitrary and capricious claim and a Chevron step two argument overlap, and because of that we have not been sticky as to whether an argument in the area of overlap is characterized as a Chevron step two claim or as an arbitrary and capricious challenge. Whether a statute is unreasonably interpreted is close analytically to the issue whether an agency's actions under a statute are unreasonable. See National Ass'n. of Regulatory Util. Comm'rs v. ICC, 41 F.3d 721, 726 (D.C. Cir. 1994). But here the contention petitioners pressed at oral argument is outside the area of overlap: they challenge the Commission's assumptions about market behavior for reasons wholly independent of the statutory arguments made in their opening brief. This is not a case of a mere mischaracterization of an argument, but rather of a party raising an entirely new argument--the reasonableness of the Commission's economic judgment--in its reply brief. Since petitioners' initial brief did not in our view properly put the Commission on notice that its economic reasoning was being challenged, we do not think it appropriate to consider the arbitrary and capricious challenge. See, e.g., McBride v. Merrell Dow and Pharmaceuticals, Inc., 800 F.2d 1208, 1210-11 (D.C. Cir. 1986).
 
 III.
 
 25
 There remain petitioners' arguments directed to the Commission's requirement that cable operators provide separate security modules. As mentioned above, the Commission exempted analog-only devices from this requirement in its Reconsideration Order, and petitioners do not contest the Commission's separation requirement with respect to digital navigation devices. Petitioners' objections, then, concern only the application of the separation mandate to a rather narrow class of navigation devices:"hybrid" converter boxes capable of processing both analog and digital signals.
 
 
 26
 The first of these arguments, to which petitioners devote much effort, is that the separation requirement violates the "Eshoo Amendment," Congress's 1996 modification to section 624a of the Communications Act. See 47 U.S.C. S 544a. Section 624a, passed by Congress in 1992, directed the Commission to take steps to facilitate the compatibility of cable systems with consumer equipment, such as televisions and VCRs. The Eshoo Amendment, apparently animated by concerns that the FCC was using its power under section 624a to impose technology-forcing technical standards on the cable industry, required the Commission to "ensure that any standards or regulations developed under the authority of this section to ensure compatibility between televisions, video cassette recorders, and cable systems do not affect features, functions, protocols, and other product and service options." See 47 U.S.C. S 544a(c)(2)(D). Petitioners argue that the Commission's requirement that cable providers provide a hybrid security module constitutes a de facto mandate that the industry adopt a particular protocol, the EIA-105 Decoder Interface, that violates the "letter and spirit" of the Eshoo Amendment. Indeed, they inform us, it was a concern about the Commission's adoption of that very interface in an earlier proceeding that prompted Congress to pass the Eshoo Amendment in the first place. Cf. Compatability Order at 4127.
 
 
 27
 Even granting the dubious proposition that the Commission has mandated the cable industry's use of the Decoder Interface in the proceeding under review,[8] petitioners' argument is foreclosed by the text of the provision on which it relies. For, as the quoted language above demonstrates, the Eshoo Amendment applies only to regulations promulgated under section 624a's equipment compatibility provisions; its limitations simply do not extend to the Commission's actions in this proceeding which were pursuant to section 629's independent grant of regulatory authority. Nor do we find the legislative history inconsistent with that precise textual analysis of the statute. Although Representative Eshoo by letter to the Commission sought to support petitioners' interpretation, that "legislative future" is of almost no value, see United States ex rel. Long v. SCS Bus. & Technical Inst., 173 F.3d 870, 878-79 (D.C. Cir. 1999), modified, 173 F.3d 890 (D.C. Cir. 1999), and, in any event, contradicts her statements at the time of the bill's passage, see H.R. Rep. No. 204, 104th Cong., 1st Sess. at 215 (1995) (Additional Views of Rep. Eshoo) ("[M]y amendment does not affect section 203 [of] H.R. 1555, which assures that 'set-top' boxes will be made available to consumers through retail stores.").
 
 
 28
 We also are unpersuaded by petitioners' contention that the Commission's application of the separation requirement to the analog security components of hybrid devices impermissibly "jeopardizes" cable security in violation of section 629(b). As the Commission properly observed in its Reconsideration Order, see 14 F.C.C.R. at 7605, if the analog separation requirement will violate section 629(b) in every case, without regard to specific evidence of security risks, and if commercial provision of integrated boxes in fact creates excessive security risks, then the very mandate of commercial availability itself violates section 629(b)--which is another way of saying that section 629 violates section 629, at least with respect to those navigation devices accessing the dominant category of cable programming at the time of the 1996Act's passage. We certainly understand the Commission's reluctance to conclude that section 629(b) requires this result.
 
 
 29
 Moreover, while petitioners proffer ample evidence--evidence uncontested by the Commission, see Reconsideration Order, 14 F.C.C.R. at 7605-that analog navigation devices are more vulnerable to attacks by cable thieves than are their digital counterparts, it does not necessarily follow that packaging that security hardware in a separate module, as opposed to as an embedded part of an integrated converter box, "jeopardizes" analog security. After all, in both situations the security components themselves remain under the proprietary control of the cable operator. Petitioners do point to comments in the record explaining how the existence of a standardized industry wide common analog interface would increase the risk of theft by "restrict[ing] the development of security improvements" or by "necessarily reveal[ing] information about the proprietary technology used to provide security." Telecommunications Industry Association Petition for Reconsideration at 4-5; Comments of Ameritech New Media at 4. Conclusory statements like these are, however, insufficient to establish that the Commission's separation requirement would "jeopardize" the cable security of operators providing hybrid service--a standard which, as we discussed above, requires a showing of a substantial, as opposed to slight, risk of harm.
 
 
 30
 Petitioners bring one final argument against the FCC's application of the separation requirement to hybrid navigation devices. As noted above, the Commission had originally required all cable operators, including those offering analog programming service, to offer a separate security module. See Navigation Devices Order, 13 F.C.C.R. at 14793. Convinced by comments that analog programming was rapidly becoming obsolete, the Commission reversed itself on rehearing, and indefinitely deferred the separation requirement with respect to analog-only navigation devices. It did not, however, extend this exemption to hybrid devices, which are capable of processing both analog and digital signals. See Reconsideration Order, 14 F.C.C.R. at 7603; 47 C.F.R. S 76.1204(f). Petitioners argue that it was arbitrary and capricious for the FCC to treat analog-only and hybrid devices differently.
 
 
 31
 This claim is based on petitioners' contention that "the same factors that the Commission identified as supporting the exemption of analog-only devices ... apply with equal force to the analog security component of 'hybrid' devices." But this is an overstatement. The Commission did not abandon its separation mandate for analog-only devices out of concerns over the security problems inhering in an analog security interface. See Reconsideration Order at 7601-03. Nor did the Commission base its determination on the research and development costs of a common analog interface per se. Instead, the agency did not think it worthwhile for the industry to construct a separate analog security module (not merely an interface) that "will soon be obsolete" because of the industry's transition from analog to digital programming. Id. at 7602. The competitive access mandate of section 629(a) would be more sensibly satisfied, the Commission reasoned, by focusing the industry (and the FCC) on the equipment capable of processing digital signals. See id. at 7602-03.
 
 
 32
 Equipment, that is to say, like hybrid navigation devices. The Commission found that, unlike analog-only equipment, hybrid devices could interfere with competition in the digital marketplace. If hybrid devices were included in the deferral, it is more likely that subscribers would lack incentives to look to the marketplace for a digital navigation device if their equipment choice to receive all ser-vices was either to lease a box from the [cable operator],or to purchase a digital box at retail and obtain a separate analog box and a digital security module.Id. at 7603. In other words, the Commission thought that, because of their ability to access digital programming, hybrid devices would likely find a market in the future--a distinction that explains the Commission's differential treatment of analog-only and hybrid devices. Petitioners respond that the Commission offers inadequate evidence to support this assumption about the hybrid navigation devices market. While the Commission's order is hardly a model of comprehensiveness on this point, we disagree that its conclusion is unsupported by the record. A coalition of electronic retailers that supported the Commission's decision to exempt analog-only devices argued that many cable systems will be hybrid "for the foreseeable future," and thus should be not exempt from the separation requirement. Written Ex Parte Presentation of Circuit City et al. Moreover, the Commission's concern about hybrid devices "interfering with competition in the digital market" appears well-grounded in common sense. As intervenors observe, the ability to offer an integrated "hybrid" box capable of accessing digital programming might encourage cable operators to incorporate outdated analog functionality into their navigation devices in order to avoid the digital separation requirement. We therefore reject petitioners' final challenge to the Commission's separation requirement for hybrid navigation devices.
 
 
 33
 * * * *
 
 
 34
 For the foregoing reasons, the petitions for review are
 
 
 35
 Denied.
 
 
 
 Notes:
 
 
 [1]
 "Multichannel video programming services" include not only cable programming but also other services that provide multiple channels of video programming, such as direct broadcast satellite service. See In re Implementation of Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, 13 F.C.C.R. 14775, 14783 (1998). Since the regulations at issue in this case apply primarily to cable operators, see id. at 14800-801 (exempting satellite programming from separation requirement), we use the generic term "cable programming" to refer to all multichannel video programming services covered by the contested regulations.
 
 
 [2]
 Cable programming can be delivered by means of either analog or digital signals. An analog system transmits and receives microwave signals in their original form; a digital system, on the other hand, translates the original signal into a binary code, and decodes that signal upon receipt. Because of the increased complexity involved in digital signal delivery methods, digital programming is far less susceptible to theft than analog programming.
 
 
 [3]
 See In re Implementation of Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, 12 F.C.C.R. 5639 (1997) ("Notice of Proposed Rulemaking").
 
 
 [4]
 See In re Implementation of Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, 14 F.C.C.R. 7596 (1999) ("Reconsideration Order").
 
 
 [5]
 Petitioners do challenge the separate security requirement insofar as it applies to the analog programming delivery function of "hybrid" navigation devices. We treat this argument infra.
 
 
 [6]
 We reject petitioners' rather labored contention that section 629(d)(1), which states that "[d]eterminations made or regulations prescribed with respect to commercial availability ... before the [date of the Telecommunications Act of 1996] shall fulfill the requirements of this section," prohibits the Commission's ban on integrated navigation devices. While we doubt that section 629(d)(1) proscribes the Commission from altering commercial availability determinations made prior to the 1996 Act, that provision is not even implicated in this case since the earlier Commission "determination" relied on by petitioners became final after the 1996 Act was enacted. See Order on Reconsideration, In re Implementation of Section 17 of the Cable Television Consumer Protection and Competition Act of 1992, Compatibility Between Cable Systems and Consumer Electronics Equipment, 11 F.C.C.R. 4121 (1996) (issued on April 10, 1996, after 1996 Act's effective date) ("Compatability Order").
 
 
 [7]
 Or perhaps, somewhat paradoxically, it is the lack of these benefits that makes the ban necessary. The statute requires "commercial availability," but does not condition that availability on an improvement in consumer welfare. So even if it were merely the transaction costs that "impeded" consumers from buying devices at retail, the Commission might be authorized to take affirmative steps to create a retail market.
 
 
 [8]
 The Commission insists, quite plausibly, that it has done no such thing. Its regulations make no reference to the Decoder Interface nor to any other particular protocol; to the contrary, they require only the industry's development of a "commonly used interface or an interface that conforms to appropriate technical standards promulgated by a national standards organization." 47 C.F.R. S 76.1204(b).